**1276**

is merely lumped together with two other pieces of exculpatory evidence, the nondisclosure of which was held to "taint" the indictment. 470 F.Supp. at 1353. In summary, all of movants' authorities are sharply distinguishable as post-indictment cases. Quite apart from this distinction, none of the cases points persuasively to the result movants seek here; rather, all are consistent with the rationale and result in this case.

### IV.

Courts have supervisory powers over grand jury proceedings. They must have these powers to ensure the fundamental fairness implicit in the Fifth Amendment's prohibition that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." But these powers are limited, especially at the pre-indictment stage, in recognition of the need for grand jury independence and efficiency and of the broad discretion prosecutors enjoy in selecting and presenting evidence. Accordingly, courts should exercise the power to interfere with ongoing grand jury proceedings and to direct the presentation of certain exculpatory evidence only where necessary to prevent a due process violation or a manifest miscarriage of justice. Neither of these dire consequences occurred when the government chose not to present the ITC Report to the grand jury. Movants' motion must therefore be denied.

An appropriate order has issued.

moreland Coal Company, Inc.; and Wynchester Mining Company, Inc., Plaintiffs,

v.

**William K. REILLY, Administrator, United States Environmental Protection Agency, Defendant.**

**Civ. A. No. 2:87–0834.**

United States District Court, S.D. West Virginia, at Charleston.

Dec. 28, 1989.

**WEST VIRGINIA COAL ASSOCIATION; West Virginia Mining and Reclamation Association; American Electric Power Fuel Supply Corporation; Cannelton Industries, Inc.; Elk Run Coal Company, Inc.; Omar Mining Company; U.S. Steel Mining Company, Inc.; West-**

James R. Snyder, Jackson & Kelly, Charleston, W.Va., for plaintiffs.

Stephen M. Horn, Asst. U.S. Atty., Charleston, W.Va., Bradley S. Bridgewater, Land & Natural Resources Div., Washington, D.C., for defendant.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the plaintiffs' motion for summary judgment. The question presented to the court is whether the United States Environmental Protection Agency (hereinafter, "EPA") has statutory authority under the Clean Water Act to adopt a policy which generally prohibits in-stream treatment ponds and fills and to object to draft National Pollutant Discharge Elimination System permits submitted to it by the West Virginia Department of Natural Resources on the basis that the draft permits authorize such ponds and fills.

## I. *Background*

In its memorandum order of March 6, 1989, the court set forth a major portion of the facts and the statutory and regulatory framework; however, since that time supplemental materials have been submitted to the court. In light of the additional information, and in the interest of analytical clarity, a recount of the facts and law is now provided.

### A. Statutory Framework

The controversy arises from the Federal Water Pollution Control Act of 1948, ch. 758, 62 Stat. 1155, *as amended by* the Clean Water Act of 1977, Pub.L. 95–217, 91 Stat. 1567, 1575 (current version at 33 U.S.C. § 1251–1387 (1987)). (The entire statutory embodiment will hereinafter be referred to as the "Clean Water Act" or the "Act.") Congress' objective in enacting the Clean Water Act was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by, *inter alia*, the control and eventual elimination of discharges of pollutants into the waters of the United States. 33 U.S.C. § 1251.

On July 9, 1970, President Nixon signed and delivered to Congress The Reorganization Plan No. 3 of 1970, thereby establishing the Environmental Protection Agency (hereinafter, "EPA") as an independent agency within the Executive branch. Reorg. Plan No. 3 of 1970, 40 C.F.R. 1.1 (1970), *reprinted in* 5 U.S.C. app. at 99 (1989 Supp.) and in 84 Stat. 2086 (1970). In enacting the Clean Water Act, Congress charged the Administrator of the EPA (hereinafter, "Administrator") with largely exclusive administration of its provisions. 33 U.S.C. § 1251(d).

Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) prohibits the discharge of any pollutant, except in compliance with specific enumerated sections of the Act, including section 402 and section 404, the sections at issue here.

Section 402, 33 U.S.C. § 1342, establishes the National Pollution Discharge Elimination System (hereinafter "NPDES"). The NPDES is a permit program pursuant to which EPA is given authority to issue permits for the discharge of pollutants, notwithstanding the general prohibition contained in section 301. Issuance of permits is conditioned upon compliance by the permittees with all effluent elimination requirements established in the Act or with conditions imposed upon the permit deemed necessary by the Administrator to carry out the provisions of the Act. 33 U.S.C. § 1342(a)(1). Section 402(b) allows states desiring to implement their own NPDES program to submit to the Administrator a proposed NPDES program. 33 U.S.C. § 1342(b). Such delegation of administration of the NPDES program is consistent with Congress' intent to preserve in the states the primary responsibility and right to control pollution in their own waters. 33 U.S.C. § 1251(b). Once a state's program has been approved, section 402(c)(1) requires EPA to suspend its own issuance of NPDES permits for the waters covered by the state program. 33 U.S.C. § 1342(c)(1). To attain approved status, the state program must insure compliance with all applicable federal water quality standards. 33 U.S.C. § 1342(b)(1)(A).

EPA retains oversight dominion over the state program primarily through two mechanisms. First, section 402(d)(1) requires states to provide the Administrator with copies of all NPDES permit applications. 33 U.S.C. § 1342(d)(1). Under section 402(d)(2), the Administrator retains the power to object to the state's issuance of a permit as being outside the guidelines and requirements of the Clean Water Act. If the state fails to submit a revised permit which satisfies the Administrator's objections, EPA may issue its own permit containing its own conditions. 33 U.S.C. § 1342(d)(4). The second, more drastic, mechanism available to the Administrator to insure compliance with the Clean Water Act is withdrawal of state NPDES program approval. 33 U.S.C. § 1342(c)(3).

Section 404 of the Clean Water Act, 33 U.S.C. § 1344, empowers the Secretary of the Army to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Permits for

the discharge of dredged or fill material issued pursuant to section 404 are expressly excepted from the application of the NPDES program, 33 U.S.C. § 1342(a), which provides "Except as provided in sections 1328 and 1344 of this title, the Administrator may, ... issue a permit for the discharge of any pollutant." In order to minimize confusion as to the application of the NPDES and the dredge and fill permit programs, Congress commanded that the Secretary of the Army enter into an agreement with the Administrator in order to "minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of permits." 33 U.S.C. § 1344(q). To that end, the Secretary of the Army and the Administrator entered into a memorandum of agreement on February 28, 1986, to address the applicability and overlap of the 402 and 404 permit programs. *See* 51 Fed.Reg. 8871 (1986).

## B. Facts

On May 20, 1982, EPA approved West Virginia's NPDES program. 47 Fed.Reg. 22,363 (1982). That approval was based on a "determination by the EPA Administrator that the West Virginia program for the control of discharges into navigable waters within their jurisdiction satisfies the requirements of section 402(b)" of the Clean Water Act. The state NPDES program is administered by the West Virginia Department of Natural Resources Division of Water Resources (hereinafter, "DNR"). W.Va.Code § 20–5A–4.

Sometime after 1982, EPA identified certain areas of concern with the West Virginia program and the State and EPA entered into an agreement, effective January 5, 1987, for the purpose of bringing the state program into full compliance with the mandates of the Clean Water Act. Agreement Regarding the National Pollutant Discharge Elimination System (NPDES) Permit Program Between the U.S. Environmental Protection Agency, Region III and the State of West Virginia, Jan. 5, 1987, Defendant's Memorandum in Support of Defendant's Motion to Dismiss, Exhibit 1. Particularly, EPA noted that it was "concerned about the use of in-stream ponds for the treatment of coal mining wastewaters in West Virginia." *Id.* at 10. Pursuant to the agreement, West Virginia agreed to develop and propose to EPA an in-stream treatment pond policy setting forth restrictions on the use of such ponds and proposed guidelines for the implementation of such policy. *Id.* EPA concurrently pledged to develop and implement its own nationwide policy. *Id.*

By letter dated July 10, 1987, the Director of the Water Management Division of Region III of EPA, Alvin Morris, advised DNR that West Virginia's proposed in-stream treatment policy was unacceptable as it was inconsistent with the Clean Water Act and West Virginia Water Quality Standards. Complaint, Exhibit A. Accompanying the letter was a document entitled "EPA Region III Policy for In-stream Treatment of Mining Wastewaters," (hereinafter, "1987 policy"). *Id.* The policy announced that "[t]he impoundment of waters of the United States for instream treatment of mining related wastewaters is prohibited." *Id.* at 1. The policy further provided that in instances where DNR determines that (1) there exists no feasible alternative to in-stream treatment and (2) that any lowering of water quality would comply with federal antidegradation regulations, EPA would not object provided certain conditions were met.[1]

---

1. Those conditions were set forth as follows:
 1. Such facility will be located as close as feasible to the headwaters of the stream.
 2. Placement of dredged or fill material for construction and operation of such facility will be in compliance with any permit issued under Section 404 of the Clean Water Act and applicable State wetland regulations.
 3. Placement of any material for construction and operation of such facility will be consistent with the guidelines issued under the authority of Section 404(b)(1) of the Clean Water Act and 40 CFR 230.10.
 4. The discharge from such facility located in a wet weather stream will be in compliance with applicable effluent guidelines.
 5. Such facility may be located in an intermittent stream only if the discharge from the facility complies with Water Quality Stan-

In November of 1988, EPA announced a new draft policy for in-stream treatment and filling (hereinafter, "1988 policy").[2] The new policy reflects a greater willingness on the part of EPA to accommodate the coal mining industry. For example, the express prohibition on location of ponds and fills in perennial streams has been removed. *Compare* 1987 Policy, ¶ 6, n. 1 *with* 1988 Policy, ¶ 4, n. 2. The new policy reflects a greater focus on the impact on preservation and replacement of existing aquatic life. For example, the state must assure EPA that no feasible alternative exists to in-stream location only in instances where aquatic life is impacted. The 1988 policy continues the 1987 policy's goal of obtaining biological survey data from permittees.

While the plaintiffs address the 1988 policy only incidentally, presumably their argument that EPA has no authority to regulate in-stream fills and ponds extends to this policy as well as the 1987 policy. Accordingly, the court's analysis will be inclusive of both such policies.

At this point, it is necessary to digress long enough to describe the physical structures and processes that are at issue in this case. Federal and state surface mining laws require that after an area has been mined, the disturbed area be "reclaimed" and returned, to the extent possible, to its original contour and condition. *See generally* The Surface Mining Control and Reclamation Act of 1977, Pub.L. 95–87 (*codified at* 30 U.S.C. §§ 1201–1328), and the West Virginia Surface Coal Mining Reclamation

dards, in addition to applicable effluent guidelines.

6. No such facility or fill material may be located in a perennial stream or wetland, as defined in 40 CFR 230.3.

7. At the completion of mining and reclamation, settled material in such facility shall be stabilized to prevent migration of the material downstream. This may be accomplished by removal and proper disposal of the material, capping the impoundment or other appropriate measures.

2. The 1988 policy provides as follows:

EPA will not object to a proposed instream treatment pond or fill under the following conditions.

1. If the watershed drainage area above a proposed instream treatment pond or fill is greater than 200 acres, the following conditions must be met:

a(1). Fish or those invertebrates necessary for supporting downstream fish life are not found in the stream segment impacted by the instream facilities, and

(2). There are not feasible alternative sites for the instream facilities, or

b(1). Fish or those invertebrates necessary for supporting downstream fish life are found in the stream segment impacted by the instream facilities, and

(2). The instream facilities do not impact stream segments containing fishable populations, and

(3). There are no feasible alternative sites for the instream facilities, and

(4). The loss of aquatic life in the stream segment impacted by the instream facilities will be compensated by the establishment of a permanent aquatic life habitat in that stream or, if not practical, a nearby area. The habitat must support an aquatic community

which will be a significant improvement in quality and quantity over the existing aquatic community and will not adversely affect any downstream aquatic community. This mitigation must be included as a condition to the Nationwide Section 404 permit applicable to the proposed instream filling operations.

2. Timber cutting on the proposed mining area must not begin until after any necessary biological surveys have been provided.

3. The instream facilities must be located as close as feasible to the mining area and headwaters.

4. The instream facilities must not be located in a wetland, as defined in 40 CFR Section 230.3.

5. The instream facilities must be designed and operated to prevent contamination of groundwater and the stream ecosystem during and after cessation of operation.

6. At completion of mining and reclamation, settled material in any permitted instream treatment pond must be stabilized in accordance with appropriate state and federal migration of the material downstream. This may be accomplished by removal and proper disposal of the material, capping the impoundment or other appropriate measures.

7. The performance bond must be sufficient to provide adequate reclamation of instream ponds and any associated fills.

8. Discharges from all instream treatment ponds must comply with applicable state water quality standards at the outfall except for ponds located on very small streams which flow only in direct response to precipitation. *EPA Draft Policy for Instream Treatment and Filling by the Coal Mining Industry,* Defendant's Motion to Extend Time or in the Alternative Response to Plaintiffs' Additional Material, Attachment A at 3–4.

Act, W.Va.Code §§ 22A–3–1 to 22A–3–40. Due to the "swell factor" associated with earth removal, not all the earth and rock that was removed during mining operations is needed to return the land to its original contour. The excess earth and rock, or "overburden" or "spoil" as it is sometimes called, must be disposed of in a manner consistent with federal and state law. 30 U.S.C. § 1265(b)(22) and W.Va.Code § 22A–3–12(b)(22).

"Valley fills" are constructed from and used to dispose of the spoil or coal mine waste material generated during mining operations. The fills are constructed by filling a designated portion of a valley with spoil or waste material. Fills that are constructed at the beginning of a valley are called "head-of-hollow" fills. Diversion ditches and underdrains must be provided when spoil or waste is disposed of in a valley or head-of-hollow fill in order to insure that the fill remains stable and not subject to slippage. The water collected by these drainage systems is channelled away from the fill and eventually into a sedimentation pond.

The ponds at issue are located in existing streambeds downstream from the fills. A treatment pond will generally be constructed by filling the stream at a designated location with earth and rock to create an embankment or dam which causes the water to pond. The primary purpose of the pond is to allow sediments suspended in the runoff to "settle out" of the water. The water is then discharged from the pond back into the existing stream through an outlet. *See* Affidavit of Harry Douglas McKenzie, Affidavits Volume of Additional Submission of Plaintiffs in Support of Motion for Summary Judgment at 3–4. It is undisputed that an NPDES permit is required for the discharge from the pond into the stream at the outlet. Reply of Plaintiffs to EPA's Response to Additional Submissions of Plaintiffs at 9. The controversy lies in the portion of the stream above the embankment. That portion consists of the upper segment of the stream which is filled in. It consists also of the remainder of the stream used to transport runoff

from the fill and the watershed area to the treatment pond. It consists as well of the pond itself which lies in the lower portion of the stream above the embankment.

Since the announcement of its 1987 policy, EPA has objected to 41 draft permits of 700 submitted to it by DNR on the basis of its concerns about in-stream treatment. Defendant's Motion for Extension of Time or, In Alternative Response to Additional Submission of Plaintiffs in Support of Motion for Summary Judgment at Attachment A. The objection letter dated October 6, 1987, from Mr. Morris to DNR regarding the Marrowbone Development Company mine at Tom's Branch is typical of most of the objection letters submitted to the court and, therefore, its contents will be focused on for analysis. Affidavit of Harry Douglas McKenzie, Affidavits Volume of Plaintiffs Additional Submission at Exhibit A.

The draft permit submitted for the mine apparently contained a proposed in-stream treatment pond and two valley fills. The pond was to be 1,000 feet downstream from one of the fills. The objection letter stated that EPA objected to the permit on the basis of violation of the West Virginia Anti-degradation policy contained in the West Virginia Water Quality Standards, CSR § 46–1–4.1, because under that regulation waste assimilation and transport are not authorized uses of streams. EPA further stated that the project contained one or more "point source" discharges into the waters of the United States upstream from the pond which would go untreated, thereby violating the Clean Water Act by not meeting applicable effluent limitations. In the letter, EPA agreed to withdraw its objection provided information was submitted to EPA sufficient to demonstrate certain conditions, including a demonstration that no feasible alternative existed to locating the sediment pond in the stream. A biological study of aquatic life in the stream was requested and DNR was informed that all point sources into Tom's Branch where aquatic life existed would have to meet federal effluent limitations

and state water quality standards.[3] The letter further stated that "[t]he proposed project may also require an individual permit under Section 404 of the Clean Water Act due to the extensive stream filling necessary to construct the valley fills."

Of the 41 draft permits objected to by EPA on the basis of in-stream treatment, only six remained unresolved as of March, 1989. Declaration of Daniel O. Sweeney at 2. In the instances where permits were allowed to issue, EPA either withdrew its objection in light of the additional information supplied to it, or approved subsequently modified permits. In any event, in all but the six instances, coal mining operations were allowed to proceed with the in-stream treatment and fills. Motion for Extension of Time at 5.

### C. Issues

On June 23, 1987, the plaintiffs, two coal mining associations and various mining companies, filed this suit requesting that the court declare the construction and operation of in-stream ponds and fills "not unlawful," and further declare that EPA has no authority to object to the State's issuance of NPDES permits on the basis authorizing such ponds and fills. EPA responded by filing a motion to dismiss the complaint on two grounds. First, EPA contended that the suit did not present a ripe, justiciable controversy concerning final agency action. Second, if the court were to determine that EPA's actions constituted final agency action, subject matter jurisdiction would rest not with the district courts, but rather with the courts of appeal.

In response, plaintiffs argue that district courts have subject matter jurisdiction to entertain suits alleging that an agency has acted in excess of its statutory authority. Specifically, plaintiffs contend that, under the Clean Water Act, permitting authority over in-stream treatment facilities rests with the Secretary of the Army and not the EPA. Thus, plaintiffs urge that this court has jurisdiction to decide the narrow legal question of whether the EPA has statutory authority under the Clean Water Act to regulate in-stream treatment facilities through the NPDES permit program. The plaintiffs then filed a motion for summary judgment requesting that the court address that narrow issue.

The plaintiffs make various arguments to support their claim that EPA does not possess such authority. First, the plaintiffs contend that federal and state surface mining laws, which were approved by EPA, contemplate and provide for in-stream treatment ponds and fills. Second, the plaintiffs argue that any discharge above the point of outfall from the ponds are discharges of "fill material" and are exempted from EPA's control under section 402, 33 U.S.C. § 1342, and that, rather, such discharges are within the permitting authority of the Army Corps of Engineers under section 404. 33 U.S.C. § 1342. The plaintiffs' third contention is that the discharges are not "discharges into the waters of the United States" and are therefore not within EPA's jurisdiction. The plaintiffs make a similar argument that the fills and ponds do not violate West Virginia Water Quality Standards as EPA contends in its objection letters and, furthermore, the discharges therefrom are not "discharges into the waters of the State." Lastly, the plaintiffs contend that even if EPA has the authority to adopt such a

---

**3.** Specifically, the letter stated:

EPA Region III will remove its objections under the following conditions:

1. Information must be provided which demonstrates the following:

a. There is no feasible alternative to the location of the sediment pond in a natural watercourse, and

b. The designated use of aquatic life upstream from the sediment pond in Tom's Branch does not exist and is not attainable due to one of the reasons cited in Sections 4.1.b.1 through 4.1.b.6 of the State Water

Quality Standards. The State Water Quality Standards and, therefore, the designated uses of aquatic life, apply to all streams which support aquatic life whose life history requires residency in flowing waters for a continuous period of at least six months. A biological study would be necessary to evaluate the status of aquatic life in this stream.

2. All point source discharges into Tom's Branch, where aquatic life uses are designated, must comply with applicable federal effluent limitation guidelines and State Water Quality Standards.

policy and implement it through objection to NPDES permits, such policy as adopted constitutes unlawful rulemaking for failure to comply with the rulemaking procedures set forth in the Administrative Procedures Act, 5 U.S.C. §§ 552–553.

EPA meets the plaintiffs' contentions by stating that (a) the "waters of the United States" over which EPA has regulatory control cannot be removed from the purview of the Clean Water Act merely by impounding those waters; (b) such ponds and fills do not comply with state water quality standards as required by the Clean Water Act; (c) EPA's authority to regulate internal waste streams authorizes the instream treatment policy; and (d) because EPA may veto a permit issued by the Army pursuant to section 404(c), 33 U.S.C. § 1344(c), its policy is further authorized and appropriate.

## II. *Discussion*

### A. Jurisdiction

█ EPA asserts that it has never used its in-stream policies as a basis for blocking draft NPDES permits and, therefore, the policies do not constitute final agency action reviewable by this court. The materials submitted, however, indicate otherwise. Specifically, EPA stated in its letter dated July 10, 1987, that "We urge your acceptance of this instream treatment policy.... In the meantime, we intend on using it as a basis for commenting or objecting to draft NPDES permits." Complaint, Exhibit A.

EPA cites the recent decision of the Seventh Circuit in *American Paper Institute, Inc. v. U.S.E.P.A.*, 882 F.2d 287 (7th Cir. 1989), as supporting its contention of nonreviewability. However, in *American Paper*, the court stated that in order for action by an agency, such as the one at issue here, to be reviewable, "[i]t must have bite—it must at least control the states or the permit holders, rather than serve as advice about how the EPA will look at things when the time comes." *Id.* at 289.

Although at the time the DNR became aware of the policies, such policies constituted mere advice concerning EPA's potential posture on the fills and ponds, it ap-

pears that EPA has taken the exact course of action of which DNR was advised; EPA has used the policy to object to draft permits on 41 occasions.

It appears to the court that the Fourth Circuit decision in *Champion International Corp. v. U.S.E.P.A.*, 850 F.2d 182 (4th Cir.1988), is controlling. In that case, the Fourth Circuit addressed the jurisdictional limits of a federal district court to entertain challenges to EPA action under the Clean Water Act. In *Champion*, a dispute arose between North Carolina and Tennessee concerning the appropriate amount of color removal necessary for Champion to comply with the Clean Water Act. Champion operated a pulp and paper mill in Canton, North Carolina, on the Pigeon River, twenty-six miles upstream from the North Carolina–Tennessee border. Tennessee was concerned about the aesthetic quality of the color of the Pigeon River. *Id.* at 184.

After North Carolina approved a draft permit with a color removal limitation that did not take into account aesthetic considerations, Tennessee informed North Carolina of its objection and ultimately asked the EPA to intervene. Soon thereafter, North Carolina issued a final permit identical to the draft permit. On August 6, 1985, EPA formally objected to North Carolina's issuance of the permit and assumed permitting authority. *Id.* at 184–85.

Thereafter, Champion brought a declaratory and injunction action in the district court on the basis that EPA's objections to the permit were invalid and that the EPA was without power to assume permitting authority. Champion appealed from an order granting EPA summary judgment.

The Fourth Circuit began its opinion by stating: "We must first address the issue of whether the district court should have entertained this suit at all or should have summarily dismissed the same for want of subject matter jurisdiction." *Id.* at 185 (footnote omitted). Relying on the Supreme Court's decision in *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), the Fourth Circuit held:

> We are of the opinion the district court had subject matter jurisdiction to enter-

tain the suit …, to the extent that it properly inquired whether the EPA had exceeded its delegated authority. When that question was ascertained favorably to EPA, the district court should have gone no further and should have dismissed for want of subject matter jurisdiction to consider the merits of the various objections EPA made to the North Carolina permit. *Leedom v. Kyne* requires that a federal court ascertain whether an administrative agency is acting within its authority and if the decision is that the agency is within its authority, the court is then required to dismiss the case for want of subject matter jurisdiction when the subject matter is one entrusted to the agency or in which review of the administrative decision has been specifically prescribed by Congress.

*Id.* at 185–86, 79 S.Ct. at 182–83 (footnote omitted; citation omitted).[4]

On March 6, 1989, this court entered an order announcing that analysis of the appropriateness of EPA's promulgation and implementation of its in-stream treatment policy would proceed on the limited inquiry, as set forth in *Champion*, of whether EPA has "clearly exceeded" its authority under the Clean Water Act. If the court now finds that EPA has not done so, it is required to dismiss the action for lack of subject matter jurisdiction, jurisdiction having been found to remain with the agency. *See Champion International Corp. v. U.S.E.P.A.*, 850 F.2d 182 (4th Cir.1988); and *Phillip Morris, Inc. v. Block*, 755 F.2d 368 (4th Cir.1985).

### B. Conflict With Surface Mining Laws

■ Initially, in their Memorandum in Support of Motion for Summary Judgment,

the plaintiffs assert that EPA's in-stream policy is in "direct conflict with the federal Surface Mining Control and Reclamation Act" (hereinafter, "SMCRA"), 30 U.S.C. §§ 1201–1328 (1986), inasmuch as that body of federal law authorizes in-stream fills and ponds. *Id.* at 12. The plaintiffs subsequently concede that such laws and regulations do not expressly require that fills and ponds be located in existing stream courses. *See* Reply of Plaintiffs to EPA's Response to Additional Submission of Plaintiffs at 2, n. 1. Rather, the plaintiffs contend that due to the mountainous character of portions of West Virginia where surface mining occurs, the SMCRA and the regulations promulgated thereunder have the practical effect of requiring in-stream location.

Plaintiffs correctly note that SMCRA and the West Virginia Surface Coal Mining and Reclamation Act (hereinafter, "WVSCMRA") contain provisions relating to sedimentation ponds and refuse disposal. Those Acts generally require sediment-laden runoff to be treated, 30 U.S.C. § 1265(b)(10)(B)(i) and (ii), and W.Va.Code § 22A–3–12(b)(10)(B), and refuse to be disposed of in an environmentally sound manner, 30 U.S.C. § 1265(b)(22); and W.Va. Code § 22A–3–12(b)(22). Furthermore, both Acts provide for the protection of water quality by minimizing "the disturbances to the prevailing hydrologic balance at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation." 30 U.S.C. § 1265(b)(10); and W.Va.Code § 22A–3–12(b)(10). Moreover, both Acts contain numerous references to federal and

---

**4.** *See also Phillip Morris, Inc. v. Block,* 755 F.2d 368 (4th Cir.1985), where the Fourth Circuit stated:

It is a "long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corporation,* 303 U.S. 41, 50–52, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938); *see McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); *Eastern Band of Cherokee Indians v. Donovan,* 739 F.2d 153,

156 (4th Cir.1984); *American Federation of Government Employees, AFL–CIO v. Nimmo,* 711 F.2d 28, 31 (4th Cir.1983). This court has noted, however, that judicial intervention is authorized when an agency acts in "brazen defiance" of its statutory authorization. *Mayor and City Council of Baltimore v. Mathews,* 562 F.2d 914, 920 (4th Cir.1977), *vacated on other grounds,* 571 F.2d 1273 (4th Cir.), *cert. denied,* 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 171 (1978); *see Leedom v. Kyne,* 358 U.S. 184, 188, 79 S.Ct. 180, 183, 3 L.Ed.2d 210 (1958). *Id.* at 369–70.

state water quality standards and generally require that those standards be met.

Specifically, the plaintiffs argue that the Office of Surface Mining (hereinafter, "OSM") regulations, which require that placement of excess spoil material be such that maximum stability is ensured by placing such fill in the "most moderately sloping and naturally stable area available," 30 C.F.R. § 816.71, necessitate placement of fills in "head of hollows" and in valleys in areas of rugged terrain. Most of these hollows and valleys contain existing streams. The plaintiffs point to various regulations promulgated under SMCRA as authorizing such placement; however, upon examination of the regulations cited, it appears that the regulations do not conflict with EPA's regulation of in-stream fills and ponds; rather, they merely recognize such placement as a possibility. For example, 30 C.F.R. § 816.71(f) provides that *"[I]f* the disposal area contains springs, *natural or manmade water courses,* or wet weather seeps, the fill design shall include diversions and underdrains as necessary to control erosion, prevent water infiltration into the fill, and ensure stability." (Emphasis supplied.) The plaintiffs argue that because OSM regulations, such as the one above, address in-stream placement of fills and because EPA concurred in the promulgation of such regulations, *see* 47 Fed.Reg. 47221, EPA cannot now assert jurisdiction over such fills and treatment ponds. It is clear from a reading of 30 C.F.R. § 816.71(f) that OSM did not intend to go so far as to usurp EPA's jurisdiction over the protection of water quality of the nation's waters. The OSM regulations are targeted at stability of reclamation efforts and address the quality of water leaving the fills only incidentally. As noted above, SMCRA expressly requires that any runoff meet federal and state water quality standards. It is clear that Congress intended that the regulation of the quality of water, including water connected with mining operations, be carried out by EPA. The plaintiffs' argument that EPA cannot regulate such water because of the conflict with OSM is without merit.

## C. Regulation of Fills and Discharges Therefrom

As earlier noted, section 402 charges EPA with permitting authority for the discharge of "any pollutant"; however, the discharge of "dredged and fill material" is expressly excepted from EPA's authority. 33 U.S.C. § 1342(a)(1). Section 404, 33 U.S.C. § 1344, charges the Secretary of the Army with authority to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The plaintiffs contend that this exception serves to carve out of EPA's jurisdiction the authority to regulate surface mining in-stream fills and treatment ponds as well as the discharges therefrom.

At the outset, it is noted that the question before the court is not whether or to what extent the Secretary of the Army holds companion authority over portions of in-stream treatment pond construction and disposal of waste or spoil material. Rather, the issue to be decided is whether EPA has statutory authority over such construction and disposal so that it may lawfully object to and prohibit the fills and ponds on the ground that the discharges therefrom do not comply with the Clean Water Act and on the further ground that the Secretary of the Army has ceded to EPA the control of fill material not used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody.

Since the time the Clean Water Act was enacted, some confusion has existed as to the parameters of the Army's and EPA's permitting authority. The peculiar nature of in-stream treatment pond construction and disposal of waste or spoil involves not only the placement of fill material (construction of waste or spoil fills and of the embankment of the pond), but also the discharge of fill material which emanates from the waste or spoil fills and ponds. Questions as to the respective agencies' authority center upon the nature of the substance being discharged, the Army generally having authority over the discharge

of fill, EPA having authority over the discharge of pollutants.

A "discharge of a pollutant" is defined by EPA as follows:

Any addition of any "pollutant" or combination of pollutants to "waters of the United States" from any "point source,"

. . .

. . . .

This definition includes additions of pollutants into waters of the United States from: surface runoff which is collected or channelled by man; discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other person which do not lead to a treatment works; and discharges through pipes, sewers, or other conveyances, leading into privately owned treatment works.

40 C.F.R. § 122.2. EPA further defines "pollutant" as follows:

*Pollutant* means dredged spoil, solid waste, incinerator residue, filter backwash, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, . . . heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural wastes discharged into water.

40 C.F.R. § 122.2.

Both EPA and the Army define "discharge of fill material" as follows:

*Discharge of fill material* means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary to the construction of any structure; the building of any structure or impoundment requiring rock, sand, dirt, or other materials for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and

revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; and artificial reefs.

33 C.F.R. § 323.2(f) [Army's regulation]; 40 C.F.R. § 232.2(f) [EPA's regulation].[5] EPA regulations further define fill material as "any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body for *any* purpose." 40 C.F.R. § 232.2(i) (emphasis supplied).

It is apparent from EPA's definition that the term "pollutant" is inclusive of fill material; however, it is a pollutant the discharge of which is exempted from EPA's permitting authority under section 402.

Plaintiffs argue that the fill material used to construct the in-stream treatment ponds as well as the fill material placed in the valleys or hollows falls within EPA's own definition of fill material because it "changes the bottom elevation of a water body for any purpose"; therefore, the authority to issue permits for the placement of fill material, as well as for discharges therefrom, resides with the Secretary of the Army and not with the EPA.

The confusion arises because Army regulations define fill material differently than EPA's definition set forth above. The Army's definition reads as follows:

The term "fill material" means any material used *for the primary purpose of* replacing an aquatic area with dry land or of changing the bottom elevation of an [sic] waterbody. *The term does not include any pollutant discharged into the water primarily to dispose of waste*, as that activity is regulated under section 402 of the Clean Water Act.

33 C.F.R. § 323.2(e) (1977) (emphasis supplied). Had the Army defined fill material in the same manner as EPA, i.e., to include material which "changes the bottom elevation of a water body, for any purpose,"

---

**5.** The Army Corps of Engineers has tacked onto its definition an exclusion which is not relevant

to the issue before the court.

then it would appear that EPA would indeed lack jurisdiction to regulate valley fills and the discharges therefrom through the NPDES permitting program. However, because the Army's definition of fill material includes only material placed for the "primary purpose" of "changing the bottom elevation of a waterbody," it would appear that the Army never intended to regulate the disposal of waste or spoil in valley fills. The primary purpose of the fills and treatment ponds is to dispose of waste or spoil and treat sediment-laden water, not to create dry land such as is needed for construction of buildings or land development, as contemplated by the Army's definition above.[6]

Due to the confusion over the permitting authority for the discharge of fill material, the Army and EPA, entered into a memorandum of agreement dated February 28, 1986, for the specific purpose of clarifying the parameters of their respective permitting programs.[7] Paragraph B.5 of the agreement provides in pertinent part:

> [A] pollutant [fill material] (other than dredged material) will normally be considered by EPA and the Corps to be subject to section 402 if it is a discharge in liquid, semi-liquid, or suspended form or if it is a discharge of solid material of a homogeneous nature normally associated with single industry wastes, and from

a fixed conveyance, or if trucked, from a single site and set of known processes. These materials include placer mining wastes, phosphate mining wastes, titanium mining wastes, sand and gravel wastes, fly ash, and drilling muds. As appropriate, EPA and the Corps will identify additional such materials.

The plaintiffs argue that inasmuch as coal mining is an extensive and well known industry, its conspicuous absence in the activities listed above indicates an intent on the part of EPA to exempt the discharges at issue from the scope of section 402. This argument, however, contradicts the clear language of the memorandum of agreement. Sediment-laden runoff emanating from the valley fills is a "discharge in liquid, semi-liquid, or suspended form." Moreover, the Army's definition of "fill material" includes the clarifying statement that it "does not include any pollutant discharged into the water primarily to dispose of waste." The discharges emanating from the valley fills are indeed primarily for the purpose of disposing of waste. This waste is channeled directly into a pond for treatment. Furthermore, EPA has expressed concern that pollutants other than sediment will be found in the discharge due to the leaching of water through the refuse fills.[8] Clearly, EPA has jurisdiction over the discharge of these other pollutants.[9]

---

6. In the preamble to the Memorandum of Agreement entered into by the Army and EPA, *infra,* it was explained that:

> The Army Corps of Engineers' definition of "fill material" provides that only those materials discharged for the primary purpose of replacing an aquatic area or of changing the bottom elevation of a waterbody are regulated under the Corps section 404 permit program. These discharges include discharges of pollutants intended to fill a regulated wetland to create fast land for development. The Corps' definition excludes pollutants discharged with the primary purpose to dispose of waste which, under the Corps definition, would be regulated under section 402.

7. The agreement was published in the Federal Register at 51 Fed.Reg. 8871 (March 14, 1986). The EPA recently affirmed the agreement as agency policy. *See* 53 Fed.Reg. 20764 (June 6, 1988).

8. EPA has indicated that some of the permit applications at issue indicate that the sediment

may be toxic due to the nature of the refuse contained within the fills and thus require treatment. Defendant's Supplemental Response to Plaintiffs' Additional Submission at 4. The plaintiffs do not dispute this contention entirely, although they state that "the ponds are *almost without exception* sedimentation or siltation ponds." Plaintiffs' Additional Submission at 3.

9. Section 301(e) of the Clean Water Act provides that federal effluent limitations shall be applied to "all point sources of discharge of pollutants." 33 U.S.C. § 1311(e). EPA defines "point source" as "any discernible confined, and discrete conveyance, including but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, vessel, or other floating craft for which pollutants are *or may be* discharged." 40 C.F.R. § 122.2 (emphasis supplied).

Clearly, EPA contemplates regulating not only conveyance systems which in fact discharge pol-

As for the construction of the embankment for the ponds, it appears that the placement of fill material for this purpose does fall within the Army's definition of fill material inasmuch as the embankment is constructed for the "primary purpose" of "changing the bottom elevation" of the stream in which it is constructed in order to create a treatment pond. In its 1988 policy, EPA concedes that the Secretary of the Army possesses some authority over such portions of in-stream treatment pond construction. In that policy it is stated:

> The Corps of Engineers administers a Nationwide Section 404 permit which applies to *most* stream filling operations associated with the coal mining industry, including instream treatment pond construction and disposal of waste spoil material. EPA is concerned that the Nationwide permit may allow stream filling which will harm fish and other significant aquatic life. To minimize harm to the aquatic ecosystem, stream biological surveys and evaluations of feasible alternatives must precede filling operations in all stream segments except for headwaters of nontrout streams having watershed drainage areas of 200 acres or less.

Defendant's Motion to Extend Time or, In the Alternative, Response to Plaintiffs' Additional Material, Attachment A at 2 (emphasis supplied).

While EPA concedes that the Secretary of the Army possesses permitting authority over some phases of in-stream treatment pond construction, it has not conceded its own authority over such construction. As discussed above, EPA is the proper authority through which one must obtain a permit for discharges at point sources. Moreover, the Army has expressly disclaimed jurisdiction over such discharges inasmuch as they are for the purpose of disposing of waste. This being the case, logic dictates that in order for EPA to control discharges from the point sources involved here, it must have the authority to regulate the construction of the fills and ponds from which the discharges emanate.

lutants, but also ones that may discharge pollu-

### D. Regulation of Waters Above In–Stream Ponds

 As indicated earlier, the Clean Water Act prohibits the discharge of pollutants except pursuant to an NPDES permit issued by the EPA. The "discharge of pollutants" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). "Navigable waters" are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

In 1979, EPA developed definitional implementing regulations which provided:

(t) "Navigable waters" means "waters of the United States, including territorial seas." This term includes:

(1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) Interstate waters, including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats and wetlands, the use, degradation or destruction of which would affect or could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes;

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce;

(iii) Which are used or could be used for industrial purposes by industries in interstate commerce.

(4) All impoundments of waters otherwise defined as navigable waters under this paragraph;

(5) Tributaries of waters identified in paragraphs (t)(1)–(4) of this section, including adjacent wetlands; and

(6) Wetlands adjacent to waters identified in paragraphs (t)(1)–(5) of this section ("Wetlands" means those areas that are inundated or saturated by surface or

tants over which EPA has jurisdiction.

ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include playa lakes, swamps, marshes, bogs, and similar areas such as sloughs, prairie potholes, wet meadows, prairie river overflows, mudflats, and natural ponds); provided that waste treatment systems (other than cooling ponds meeting the criteria of this paragraph) are not waters of the United States.

40 C.F.R. § 122.2(t) (1979). On May 19, 1980, the definitional regulations were revised somewhat and provided:

> Waters of the United States means:
>
> (1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide.
>
> (2) All interstate waters, including interstate wetlands.
>
> (3) All other waters, such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which would affect or could affect interstate or foreign commerce including any such waters:
>
> (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or
>
> (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
>
> (iii) Which are used or could be used for industrial purposes by industries in interstate commerce.
>
> (4) All impoundments of waters otherwise defined as waters of the United States under this definition;
>
> (5) Tributaries of waters identified in paragraphs (g)(1)–(4) of this section;
>
> (6) The territorial sea; and
>
> (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (q)(1)–(6) of this section.
>
> Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of the Act (other than cooling ponds as defined in 40 CFR 123.11(m) which also meet the criteria of this definition) are not waters of the United States. This exclusion applies only to manmade bodies of water which neither were originally created in waters of the United States (such as a disposal area in wetlands) nor resulted from the impoundment of waters of the United States.

40 C.F.R. § 122.3 (1980) (emphasis added).

At the time this regulation was announced, EPA stated that "[b]ecause [the Clean Water Act] was not intended to license dischargers to freely use waters of the United States as waste treatment systems, the definition makes clear that treatment systems created in those waters or from their impoundment remain waters of the United States." 45 Fed.Reg. 33,298 (May 19, 1980).

On July 21, 1980, EPA suspended the above underlined sentence after concerns were voiced by industries that the last sentence suggested that they might be required to obtain permits for discharges into existing waste treatment systems, such as power plant ash ponds. 45 Fed.Reg. 48,620 (July 21, 1980). EPA agreed that the sentence could be construed too broadly and suspended it pending public comment. *Id.* The definition currently exists as set forth above without the underlined portion. *See* 40 C.F.R. § 122.2 (1988).

Plaintiffs argue that the final portion of the current definition explicitly excludes in-stream treatment ponds and the water above such ponds from the definition of waters of the United States. Plaintiffs maintain that any question as to whether the exclusion was limited to treatment ponds constructed in manmade bodies of water was answered in the negative by the 1980 suspension of the last sentence.

EPA counters that in-stream treatment ponds and the waters above such ponds are included in the definition of waters of the

United States because they constitute an "impoundment of waters otherwise defined as waters of the United States under this definition," *see* 40 C.F.R. § 232(q)(4) (1988), and that the exclusion for treatment ponds was never meant to apply to treatment ponds constructed in United States waters. According to EPA, the last sentence was not definitional, rather it was merely explanatory in nature. Accordingly, EPA contends, the suspension of the last sentence has no effect upon the clear definitional mandate that impoundments of waters of the United States remain "waters of the United States."

Judicial review of an agency's interpretation of its own regulations is sharply circumscribed. As the Supreme Court in *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), observed: "When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.... '[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Id.* at 16–17, 85 S.Ct. at 801–802 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). While the court concedes that the suspension of the last sentence creates some confusion as to the parameters of EPA's jurisdiction upon the ponds and waters at issue here, the court cannot find that EPA's interpretation of its own definitional regulation is plainly erroneous or inconsistent with either the regulation, which seems to include such impoundments, or the Clean Water Act, which Congress enacted for the purpose of keeping a tight rein on water pollution.

**10.** The West Virginia Water Pollution Control Act provides in pertinent part:

It shall be unlawful for any person, unless he holds a permit therefor from the department, which is in full force and effect, to:

(1) Allow seepage, industrial wastes or other wastes, or the effluent therefrom, produced by or emanating from any point source, to flow into the waters of this State;

### E. Violation of the West Virginia Water Quality Standards

■ EPA stated in its objection letters that the proposed fills and ponds constitute a violation of the West Virginia Anti-degradation policy. That regulation provides as follows:

It is the policy of the State of West Virginia that instream water uses shall be maintained and protected as follows:
a. Existing instream water uses and the level of water quality necessary to protect existing uses shall be maintained and protected. <u>Waste assimilation and transport are not recognized as designated uses.</u>

That regulation was adopted in compliance with EPA regulations, which require states administering their own NPDES permitting program to adopt a statewide anti-degradation policy to protect existing in-stream water uses and water quality. 40 C.F.R. § 131.12. Permits may not be issued by a state under conditions that would violate applicable state water quality standards. 40 C.F.R. § 122.4(d).

The plaintiffs attempt to skirt the apparent violation of West Virginia's anti-degradation policy by arguing, in a manner similar to their contention that the discharges are not into waters of the United States, that the discharges into the ponds and waters above such ponds are not discharges into the "waters of the State."[10] The West Virginia Water Pollution Control Act, W.Va.Code §§ 20–54–1 to 20–5A–16 defines waters of the state as:

[A]ny and all water on or beneath the surface of the ground, whether percolating, standing, diffused or flowing, wholly or partially within this State, or bordering this State and within its jurisdiction, and shall include, without limiting the generality of the foregoing, natural or

(2) Make, cause or permit to be made any outlet, or substantially enlarge or add to the load of any existing outlet, for the discharge of waters of this State;

(3) Acquire, construct, install, modify or operate a disposal system or part thereof for the direct or indirect discharge or deposit of treated or untreated waters of this State, or any extension to or addition to such disposal system.

artificial lakes, rivers, streams, creeks, branches, brooks, ponds (<u>except</u> farm ponds, <u>industrial settling basins and ponds and waste treatment facilities</u>), impounding reservoirs, springs, wells and watercourses.

W.Va.Code § 20–5A–2 (emphasis supplied).

The plaintiffs contend that the proposed in-stream ponds fall within the exception underlined above and, therefore, they are not within the scope of the state NPDES permit program. As further support of this contention, the plaintiffs offer the testimony of an assistant director of DNR, who, during a deposition in another civil action,[11] stated that the impounding of waters of the state would probably remove those waters from the waters of the state by virtue of the exception appearing in the above-stated code section. The plaintiffs also provide a decision of the West Virginia Water Resources Board[12] which indicates that the Board had permitted the temporary *de facto* removal of a portion of a stream from the waters of the state. The plaintiffs vehemently contend that the State's interpretation of its own laws and regulations controls and that EPA cannot base its objection upon its own interpretation of West Virginia Water Quality Standards. Once EPA has approved the state NPDES programs, contend the plaintiffs, it cannot interject its own interpretations and more stringent policies without first withdrawing its approval of the program pursuant to EPA's regulatory procedures.

This contention is unsupported by the statutory scheme of the Clean Water Act, which provides EPA with continuing dominion over state NPDES programs. 33 U.S.C. § 1342(d). Federal-state cooperative programs, such as the NPDES program, characteristically come "with strings attached." In *Shell Oil Co. v. Train*, 585 F.2d 408 (9th Cir.1978), the Ninth Circuit stated:

> In the area of the environment, qualifications for federal funding combined with

the delegation of operational authority to the states have been tied to state compliance with federal policies and to ongoing federal-state consultations.... The express conditioning of federal aid and the delegation of operational authority to states in compliance with federal guidelines are replete with "coercion." The unquestioned constitutional validity of these programs and other forms of cooperative federalism, secured by the Supreme Court's decisions in such cases as *Oklahoma v. Civil Service Commission* [citation omitted] and *Steward Machine* [citation omitted], means that the concept of undue influence and duress are inappropriate in this context.

*Id.* at 413–14.

Moreover, when EPA approves a state NPDES program, it suspends the issuance of permits "as to those navigable waters subject to [the State] program." 33 U.S.C. § 1342. Consequently, even if the waters are not covered by the state program, if they are "waters of the United States," EPA retains regulatory and permitting authority over them. Given that EPA voiced its concerns to the State of West Virginia sometime after 1982 and threatened withdrawal of approval, citing the issuance of permits for in-stream treatment as one of its concerns, the court will not pronounce that EPA has overstepped its authority by objecting to in-stream ponds and fills on the basis of violation of West Virginia Water Quality Standards.

### F. Administrative Rulemaking

■ Finally, the plaintiffs contend that even if EPA has authority to prohibit or regulate in-stream treatment ponds and fills, the 1987 and 1988 policies, relied upon by EPA in objecting to various permits and applications, constitute unlawful rulemaking for failure to comply with rulemaking procedures mandated by the Administrative Procedures Act (hereinafter, "APA"), 5 U.S.C. § 551 *et seq.*

---

11. *State ex rel. Potesta v. Thomas,* Civil Action No. 2:88–0329, and *Donaldson Mine Co. v. Thomas,* Civil Action No. 2:88–0328 (S.D.W.Va.), depositions of Robert K. Parsons taken on April 12, 1988.

12. *Meade v. DNR,* Appeal No. 343, and *P & C "Bituminous Coal," Inc. v. DNR,* Appeal No. 349 (West Virginia Water Resources Board).

The APA defines a "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure or practice requirements of an agency." 5 U.S.C. § 551(4). "Rulemaking" is defined as "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). The APA requires that each agency of the United States publish in the Federal Register all "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretation of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D). Generally, before an agency may adopt a rule, it must publish the proposed rule in the Federal Register and allow for public comment. 5 U.S.C. § 553(b). To this requirement of "notice and comment" rulemaking, there exist certain exceptions. Except when notice and/or hearings are required by statute, notice and comment are not required for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b).

The plaintiffs contend that EPA's in-stream treatment policy is a substantive rule having the force and effect of law. While EPA does not pointedly address this contention, the court concludes from EPA's briefs that it considers the policy to be merely EPA's interpretation of the requirements of the Clean Water Act and of the rules and regulations formally adopted by EPA.

An agency rule is considered to be "interpretive" rather than "substantive" when (1) it is not promulgated pursuant to the legislative power delegated to the agency by Congress to make rules having the force of law, or (2) the agency intends it to be "no more than an expression of its [own] construction of a statute or rule." *Chamber of Commerce of the United*

*States v. OSHA*, 636 F.2d 464, 468 (D.C.Cir. 1980). While an agency's own characterization is indicative of whether it intended the rule to be "interpretive" or "substantive," it is not dispositive. *Id.* at 468. Rather, the substance of the agency's action is decisive. *Id.* Interpretive rules merely "remind[ ] affected parties of existing duties." *Id.* at 469, *quoting Citizens to Save Spencer County v. United States Environmental Protection Agency*, 600 F.2d 844, 876 n. 153 (D.C.Cir.1979).

While at first blush EPA's written policy on in-stream treatment may appear to impose new duties upon NPDES applicants, the duties imposed are entirely consistent with the Clean Water Act and EPA's existing regulations. Congress' intent in enacting the Clean Water Act was to eliminate water pollution on a national basis. *Quarles Petroleum Co., Inc. v. United States*, 213 Ct.Cl. 15, 551 F.2d 1201 (1977). As earlier indicated, EPA regulations require that state-wide anti-degradation policies provide protection of existing water uses. 40 C.F.R. § 131.12. The proposed fills and ponds represent a plain disruption and change of the existing use of the streams in which they are located. Thus, the plaintiffs, by being required to comply with EPA's in-stream policy, are required to do no more than abide by existing federal law. Indeed, inasmuch as EPA allows the proposed construction and operations of fills and ponds to go forward provided certain conditions are met, it would appear that EPA has in some measure attempted to be reasonably accommodating in light of the mandates of the Clean Water Act and its own regulations.

Accordingly, the court finds the EPA's in-stream policy to be an interpretation of the Clean Water Act and existing EPA regulations and, therefore, compliance with the APA's notice and comment requirements is unnecessary under the circumstances.[13]

---

**13.** Although technically the EPA, by virtue of the APA, is required to publish interpretative rules, as well as substantive ones in the Federal Register before it can enforce such rules, 5 U.S.C. § 552(a)(1)(D), the fact that it was not so published is of no legal moment, to the extent persons adversely affected by such interpretive rule have "actual and timely notice of the terms thereof." 5 U.S.C. § 552(a)(1).

Having found EPA's regulation of the fills and ponds to be proper under the authority vested in EPA by the Clean Water Act, the court need not address EPA's authority to regulate the fills and ponds by virtue of its internal waste stream rule, 40 C.F.R. § 122.46(h), or to prohibit their construction through implementation of its veto power over section 404 permits, 33 U.S.C. § 1344(c).[14]

### III. *Conclusion*

In attempting to construct and operate the fills and ponds necessary to carry on mining operations and at the same time comply with all federal and state laws and regulations, the plaintiffs have been confronted with a maze of administrative rules and requirements emanating from three federal agencies (OSM, EPA and the Army Corps of Engineers) and two state agencies (DNR and the Department of Energy) that plaintiffs must satisfy in order to function.

Inasmuch as Congress has mandated that the Army, EPA and OSM meet in order to establish procedures to avoid needless delay and duplication of effort, *see*, 30 U.S.C. § 1211(c)(6) and (12) [SMRCA], 33 U.S.C. § 1251(f) and 33 U.S.C. § 1344(a) [the Clean Water Act], and, to date, no such procedures have been established, the validity of the plaintiffs' frustration is obvious. Nevertheless, the court does not find that EPA has in any way "clearly exceeded its authority," and, accordingly, it is ORDERED that the plaintiffs' motion for summary judgment be, and the same hereby is, denied.

Having determined that EPA has not exceeded its jurisdiction, the court must adhere to *Champion* and dismiss the action. *Champion*, 850 F.2d at 186 n. 11. Order shall be entered accordingly.

**14.** Those measures which are available to EPA have prerequisite procedures and findings to be made by EPA. The record before the court indicates no compliance therewith.