932 F.2d 964
 33 ERC 1353, 22 Envtl. L. Rep. 20,092
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
WEST VIRGINIA COAL ASSOCIATION, Plaintiff-Appellant,
and
West Virginia Mining and Reclamation Association, American
Electric Power Fuel Supply Corporation, Cannelton
Industries, Inc., Elk Run Coal Company, Incorporated, Omar
Mining Company, Valley Camp Coal Company, United States
Steel Mining Company, Inc., Westmoreland Coal Company,
Incorporated, Wynchester Mining Company, Incorporated, Plaintiffs,
v.
William K. REILLY, Administrator, United States
Environmental Protection Agency, Defendant-Appellee.
WEST VIRGINIA COAL ASSOCIATION, West Virginia Mining and
Reclamation Association, American Electric Power Fuel Supply
Corporation, Cannelton Industries, Incorporated, Elk Run
Coal Company, Incorporated, Omar Mining Company, Valley Camp
Coal Company, United States Steel Mining Company,
Incorporated, Westmoreland Coal Company, Incorporated,
Wynchester Mining Company, Incorporated, Plaintiffs-Appellants,
v.
William K. REILLY, Administrator, United States
Environmental Protection Agency, Defendant-Appellee.
 Nos. 90-2034, 90-2040.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 10, 1991.
Decided May 13, 1991.
 
 Appeals from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (CA-87-834-2)
 James Ronald Snyder, Jackson & Kelly, Charleston, W.V., for appellants.
 Blake Andrew Watson, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., (Argued), for appellee; Barry M. Hartman, Deputy Assistant Attorney General, J. Carol Williams, Bradley S. Bridgewater, Environment & Natural Resources Division, United States Department of Justice, Martin W. Matzen, J. Carol Williams, Land & Natural Resources Division, United States Department of Justice, Washington, D.C., Michael W. Carey, United States Attorney, Charleston, W.Va., Nandan Kenkeremath, Office of General Counsel, United States Environmental Protection Agency, Washington, D.C., Jed Z. Callen, Assistant Regional Counsel, Region III, United States Environmental Protection Agency, Philadelphia, Pa., on brief.
 S.D.W.Va., 728 F.Supp. 1276.
 AFFIRMED.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and JOSEPH H. YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 The Clean Water Act (CWA) is a comprehensive statute intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." See 33 U.S.C. Sec. 1251(a). As one means of achieving this goal, Section 402 of the Act, 33 U.S.C. Sec. 1342, establishes the National Pollutant Discharge Elimination System (NPDES) permit program. Under this program, permits are issued by either the Environmental Protection Agency (EPA) or by a state which has been given NPDES permitting authority. Although a state, having been granted permitting authority, is the primary issuer of such permits, the EPA retains oversight authority over state permit programs after they have been approved. 33 U.S.C. Sec. 1342(c).
 
 
 2
 Federal oversight of the state's NPDES program is fulfilled in part by case-by-case review of individual state-issued permits. 33 U.S.C. Sec. 1342(d). The state must give a copy of each permit that it intends to issue to the EPA for review. The issuance of a state permit is prohibited if the EPA Administrator objects because either: (1) the permitting state failed to accept recommendations from another state whose waters may be affected by issuance of the permit, or (2) the permit is "outside" the guidelines and requirements of the CWA. The Administrator may assume permitting authority by issuing a federal NPDES permit in accordance with the Act's guidelines and requirements if the state fails to submit a revised permit satisfying the Administrator's objections.
 
 
 3
 Section 404 of the CWA, 33 U.S.C. Sec. 1344, provides that the Secretary of the Army, acting through the Chief of Engineers, has the authority to issue permits for the discharge of dredged or fill material into the navigable waters of the United States at specified disposal sites. 33 U.S.C. Sec. 1344(a). The EPA Administrator has the authority under Sec. 404 to "deny or restrict" the use of any defined area as a disposal site for dredged and fill material when, after opportunity for notice and public hearing, it determines that the discharge of such material will have an unacceptable adverse impact on municipal water supplies, shellfish beds and fishery areas, wildlife, or recreational areas. 33 U.S.C. Sec. 1344(c).
 
 
 4
 Against that background we now consider the question of who has authority over the placement of fill material or water treatment ponds in small streams in West Virginia for the disposal of waste associated with surface coal mining operations. After an area has been mined, the land must be returned by "reclamation," as much as possible, to its original contour and condition. See, e.g., The Surface Mining Control and Reclamation Act of 1977 (SMCRA), Pub.L. 95-87 (codified at 30 U.S.C. Secs. 1201-1328), and the West Virginia Surface Coal Mining Reclamation Act, W.Va.Code Secs. 22A-3-1 to 22A-3-40.
 
 
 5
 It is undisputed that the discharge of the treated water from a treatment pond requires an NPDES permit. However, there has been some confusion about the regulatory authority over the use of fill to create an embankment and the channelling of water and sediment at the head of the stream prior to its reaching the water treatment pond.
 
 
 6
 Exercising its oversight authority, the EPA identified certain problems in West Virginia's NPDES permit program, and issued its own policy known as "EPA Region III Policy for In-stream Treatment of Mining Wastewaters." In accordance with that policy, it began to object to draft permits which utilized surface coal mine related fills and in-stream treatment ponds.
 
 
 7
 Since the inception of the Region III policy, the EPA has objected to 41 draft permits of 700 submitted to it by West Virginia on the basis of its concerns about in-stream treatment. Of these 41 permits, six were rejected totally. For the remaining 35 permits, the EPA either withdrew its objection in light of the additional information supplied to it, or approved subsequently modified permits.
 
 
 8
 Two West Virginia coal associations and coal producers that have or will need permits filed a suit, seeking declaratory and injunctive relief, contending that the EPA has no authority to object to the state's issuance of NPDES permits and that the adoption of the Region III policy was ultra vires and in violation of the Administrative Procedures Act. The district court denied relief and dismissed the case. Three main issues are presented on appeal. First, whether there is a ripe justiciable case over which the district court properly exercised jurisdiction; second, whether the district court erred in determining that the EPA acted within the scope of its authority under the Clean Water Act; and, third, whether the district court erred in finding that the EPA did comply with the Administrative Procedure Act in implementing its policy.
 
 A. Ripeness
 
 9
 Article III of the Constitution mandates that federal courts only address issues which are ripe for adjudication. If a dispute does not fall within this "case or controversy" requirement and is, thus, not ripe for judicial review, the court is without subject matter jurisdiction and must dismiss the case. See Regional Rail Reorganization Act Cases, 419 U.S. 102, 138 (1974); United States v. Storer Broadcasting Co., 351 U.S. 192, 197 (1956).
 
 
 10
 The district court held that a ripeness inquiry was not required since it had subject matter jurisdiction to determine whether the agency was acting in excess of its delegated authority. It interpreted Leedom v. Kyne, 358 U.S. 184, 188 (1958), as standing for the proposition that an agency action which is nonfinal, and therefore otherwise nonreviewable, may be set aside if the court finds that the agency acted beyond the authority conferred on it by statute. However, it went on to find that even if a separate inquiry into ripeness was required, the case was still properly before it according to the standards set out in Abbott Laboratories v. Gardner, 387 U.S. 136 (1967).
 
 
 11
 We do not rely upon the Leedom "exception" to the constitutional requirement of ripeness, but do agree with the finding that this case is ripe for judicial review. The controversy in this case is fit for judicial decision since it involves a purely legal issue: namely, EPA's authority under the CWA. Second, it is a final agency action and, hence, reviewable, since the in-stream policies promulgated by the EPA were used as a basis for blocking draft NPDES permits. The impact of the administrative action was direct and immediate upon those applying for permits and planning to utilize in-stream treatment and fills since such permits had already been objected to based on the policy. Abbott, 387 U.S. at 149. Appellants' assertions notwithstanding, we see no basis for concluding that the district court's findings of fact supporting ripeness were clearly erroneous.
 
 B. EPA's Statutory Authority
 
 12
 This Court's authority to review an agency's statutory authority to act, as stated in Leedom v. Kyne, supra, is extremely limited. We may conduct only a cursory review of the merits of a case to determine whether an agency action was "contrary to a specific prohibition" that was "clear and mandatory." 358 U.S. at 188; Champion Int'l Corp. v. EPA, 850 F.2d 182, 186 (4th Cir.1988). It is undisputed that such review should be available only in extraordinary circumstances. Boire v. Greyhound Corp., 376 U.S. 473, 481 (1964).
 
 
 13
 Under Champion the EPA clearly had authority to object to NPDES permits which it found to be in conflict with the CWA. 33 U.S.C. Sec. 1342(d)(1). The promulgation of the Region III policy is simply an interpretation of the Act. The fact that it serves as the basis for the EPA's objecting to NPDES permits does not constitute "brazen defiance" of the EPA's statutory authority.
 
 
 14
 Appellants raise two main issues regarding the EPA's authority over in-stream treatment and argue that, although the EPA may object to NPDES permits under Sec. 402 of the Act, 33 U.S.C. Sec. 1342, the discharge and fills in question do not fall under this aspect of the EPA's jurisdiction. First, they assert that the EPA's objections to draft NPDES permits describing in-stream water treatment facilities pursuant to the Sec. 402 NPDES permit program were in conflict with the jurisdiction of the Army Corps of Engineers under Sec. 404. Second, they argue that the EPA acted "clearly beyond" its statutory authority in interpreting its own regulations defining "waters of the United States" as encompassing in-stream treatment ponds and the waters above such ponds.
 
 
 15
 Appellants argue that jurisdiction over disposal sites lies exclusively with the Secretary of the Army. Section 404, 33 U.S.C. Sec. 1344, defines the parameters of that authority, giving the Secretary of the Army authority to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." The EPA has stipulated that it was not acting under its Sec. 404(c) veto power. Therefore, the dispute pertains to EPA's more direct involvement in the permitting scheme and who may regulate this type of fill material.
 
 
 16
 Generally, the Army has authority over the discharge fill while the EPA has authority over the discharge of pollutants. As noted by the district court, the EPA defines fill material as "any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body for any purpose." 40 C.F.R. Sec. 232.2(i). Appellants argue that, although the term "pollutant" includes fill material, such material falls under the Army's authority rather than the EPA's under Sec. 402. Since the fill material "changes the bottom elevation of a water body for any purpose," they contend, the authority to regulate the placement of the fill material and discharges from the in-stream treatment facilities lies with the Secretary of the Army.
 
 
 17
 Appellants' analysis falls short, however, since the Army regulations, 33 C.R.F. Sec. 323.2(e), provide evidence that it did not intend to regulate the disposal of mining related spoil since the primary purpose of such fills and treatment ponds is to dispose of waste and treat sediment-laden water, not to create dry land or to change the bottom elevation of the water. Clearly, the regulations appear to create a conflict in the mandate of Sec. 404 by attributing a meaning to "fill material" that arguably takes in-stream treatment systems out of the Army's authority under the Act. It therefore appears that neither the EPA nor the Secretary of the Army has jurisdiction over the disputed fill material in-stream treatment procedures.
 
 
 18
 To resolve this apparent confusion, the EPA and Army Corps of Engineers entered into a memorandum of agreement ("MOA") on February 28, 1986. Paragraph B.4.a. provides that a fill material will be subject to Sec. 404 if its "discharge has as its primary purpose or has as one principle purpose of multi-purposes to replace a portion of the waters of the United States with dry land or to raise the bottom elevation." By contrast, paragraph B.5 provides that fill will be subject to Sec. 402
 
 
 19
 if it is a discharge in liquid, semi-liquid, or suspended form or if it is a discharge of solid material of a homogenous nature normally associated with single industry wastes, and from a fixed conveyance, or if trucked, from a single site and set of known processes. These materials include placer mining wastes, phosphate mining wastes, titanium mining wastes, sand and gravel wastes, fly ash, and drilling muds. As appropriate, EPA and the Corps will identify additional such materials.
 
 
 20
 It is apparent from the MOA that the types of fills and discharges at issue in this case fall under the B.5 definition and are subject to the EPA's permitting authority under Sec. 402. The discharge of fill material at issue here is expressly for the purpose of disposing of waste or spoil from the mining operations. The EPA concedes that the Secretary of the Army may have some jurisdiction over the use of fills in the construction of the embankment for the ponds since such embankment may be said to be constructed for the "primary purpose" of "changing the bottom elevation" of the stream in which it is constructed in order to create the pond. However, the EPA has not conceded its own authority in this respect.
 
 
 21
 Appellants' argument that the MOA should not be given effect since paragraph B.5 omits mention of surface coal mining waste is without merit. Although the MOA lists specific materials, the language of the agreement implies that the list is not exhaustive since it states that "[t]hese materials include placer mining wastes, phosphate mining wastes, titanium mining wastes.... As appropriate, EPA and the Corps will identify additional such materials." (Emphasis added.)
 
 
 22
 Appellants also argue that since the activity in question was intended to be covered by the SMCRA and Sec. 404 nationwide permits, the EPA has no authority to regulate. In support of this argument, they point to the existence of a nationwide permit applicable to coal mine related discharges. 33 C.F.R. Sec. 330.5(a)(21). However, the nationwide permit covers only the discharge of the Sec. 404 material. There is no reason to conclude that all discharges from such facilities are Sec. 404 discharges and not Sec. 402 discharges. There is no evidence that the fills in question are, in fact, covered by Nationwide Permit 21.
 
 
 23
 Since appellants offer no statutory prohibition against the participation of EPA in an agreement with the Army Corps of Engineers in their efforts to define the boundaries of the respective agency's permitting authority, further review is unwarranted. See Leedom, 358 U.S. at 188.
 
 
 24
 Appellants also challenge the EPA's authority over transmitting stream segments and ponds as waste systems constructed from the impoundment of the "waters of the United States." They argue that because the treatment ponds and transmitting stream segments at issue are designed to meet the requirements of the CWA, and since 40 C.F.R. Sec. 122.2 excludes from the definition of "waters of the United States" any "waste treatment systems, including treatment ponds designed to meet requirements of the CWA," the EPA is acting beyond its statutory authority in regulating these treatment ponds and stream segments.
 
 
 25
 After reviewing the relevant law and facts, we agree with the district court's conclusion that the in-stream treatment ponds and the waters above such ponds fall within the definition of "waters of the United States," see 40 C.F.R. Sec. 122.2(d), and the EPA did not act beyond its statutory authority in regulating these waters.
 
 
 26
 The mandates in Leedom and Champion require only a review to determine if the EPA has exceeded its statutory authority or has acted in derogation of any statutory prohibitions or restrictions on its operations. Concluding that it has not, we do not reach the other issues raised in appellants' and appellee's briefs. Appellants have other administrative remedies they must first exhaust in order to challenge the EPA's actions before this Court has subject matter jurisdiction to consider their complaints. Therefore, we affirm the district court's dismissal of the case for want of subject matter jurisdiction.
 
 
 27
 AFFIRMED.