Dubois v. US DOA, et al.          95-CV-50-B     11/2/95
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW HAMPSHIRE


<u>Roland C. Dubois, et al.</u>

    v.                                    Civil No. 95-50-B

<u>U. S. Department of Agriculture, et al.</u>


                  <u>**MEMORANDUM AND ORDER**</u>

     Loon Mountain Recreation Corporation ("Loon") operates a ski
area in northern New Hampshire.  Because part of the ski area is
located in the White Mountain National Forest, Loon's operations
require a special use permit issued by the United States Forest
Service.  16 U.S.C.A. § 497(b) (West Supp. 1995).  In 1986, Loon
asked the Forest Service to amend the permit to allow it to
expand.  After several years of review, the Forest Service issued
a Record of Decision ("ROD") in 1993, approving a revised version
of Loon's expansion plan.

     Plaintiff Roland Dubois filed this action seeking to compel
the Forest Service to revoke any permits and approvals issued
under the ROD and to enjoin Loon from proceeding with its
expansion plan.  Dubois has been joined in his claims by
intervenor RESTORE: The North Woods ("RESTORE"), an environmental

organization.  Plaintiffs' principle contentions are that: (1) the ROD violates the Clean Water Act ("CWA") because it would permit Loon to discharge water from the East Branch of the Pemigewasset River into Loon Pond without a National Pollutant Discharge Elimination System ("NPDES") permit, see 33 U.S.C.A. §§ 1311(a), 1342(a) (West 1986 & Supp. 1995); (2) Loon's proposed use of Loon Pond violates water quality standards established by the State of New Hampshire pursuant to the CWA, see N.H. Code Admin. R. Env-Ws  430-440 (1991); and (3) the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C.A. § 4332 (West 1994), in preparing the Environmental Impact Statement ("EIS") for the project.  The matter is before me on the parties' cross-motions for summary judgment.[1]

---

[1]  Loon has moved to dismiss claiming that plaintiffs lack standing.  Although standing presents a question of jurisdiction that ordinarily must be addressed before moving to a case's merits, I need not determine the standing of all of the plaintiffs if at least one plaintiff has standing to maintain each claim.  Washington Legal Foundation v. Massachusetts Bar Found., 993 F.2d 962, 971-72 (1st Cir. 1993).  In this case, RESTORE alleges that its members who live and work in the vicinity of the ski area will be harmed by the proposed expansion.  It supports these allegations with affidavits from members who claim that they live in the town where Loon is located, use the town's water supply system, which relies in part on Loon Pond as a water source, and make regular recreational use of the area in which the expansion will occur.  They also allege that they will be directly affected by "noise, water quality,

# I.  BACKGROUND

The Forest Service announced Loon's request to amend its special use permit in January 1987.  Loon originally proposed to expand onto an additional 930 acres of the White Mountain National Forest.  Because of the project's scope, the Forest Service determined in January 1988 that it would prepare an EIS before acting on Loon's request.  Thereafter, the Forest Service entered into a memorandum of understanding with representatives of various federal, state, and local agencies to form a Joint Review Committee to review the public's comments and recommendations during the EIS process.[2]  The Forest Service also

---

taxes, conversion of forested areas, impacts of wildlife and a degradation of the visual quality of the town if Loon is allowed to expand."  In light of these affidavits, RESTORE has standing to bring all of the claims at issue here.  See Sandin v. Conner, 115 S. Ct. 2293 (1995); Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 885-89 (1990); United States v. AVX Corp., 962 F.2d 108, 116 (1st Cir. 1992).  Accordingly, I deny Loon's motion to dismiss.

[2]  The "formal" members of the committee were:  North Country Council; Town of Lincoln; New Hampshire Council on Resources and Development; United States Environmental Protection Agency, Region I; United States Fish and Wildlife Service; Loon Mountain recreation Corporation; Lakes Region Planning Commission; and White Mountain National Forest.  The "informal" members of the committee included national groups such as the Sierra Club; state environmental groups such as the Society for the Protection of New Hampshire Forests; New Hampshire administrative agencies; the Town of Plymouth; and the Lincoln-

hired a contractor to prepare the EIS working under the Forest Service's direction but at Loon's expense.

In February 1989, the Forest Service released a Draft EIS ("DEIS") that discussed three alternative development plans in detail after eliminating other suggested alternatives. Loon's proposal was to expand in two phases. During the first phase, Loon proposed to construct three new lifts, thirteen new trails, an up-mountain lodge on Forest Service land, and a new snowmaking system that would significantly increase the ski area's use of Loon Pond as a water source. During the second phase, Loon proposed to construct four more lifts and sixteen additional trails. Other developments would also occur on adjacent private lands during both phases of the project. The other two alternatives studied in detail were no action and a limited development alternative implementing only the first phase of Loon's proposal. The Forest Service issued a Supplement to the DEIS in November 1989 to respond to concerns arising from the unusually low water levels observed in the East Branch during the previous winter.

---

Woodstock Chamber of Commerce.

4

In January 1991, the Forest Service replaced the DEIS with a Revised DEIS ("RDEIS"). The RDEIS covered the same topics but added new information about alternatives and about the project's cumulative impacts. The RDEIS identified five alternatives: (1) no action; (2) Loon's proposal; (3) limited development implementing only the first phase of Loon's proposal with additional limitations on water withdrawals for snowmaking; (4) limited development with a smaller permit area of 320 acres; and (5) limited expansion within the existing permit area.

After another period of public comment, the Forest Service released a Final EIS ("FEIS") in November 1992. The FEIS included a new alternative that, in the words of the Forest Service, "consolidates and refines elements of all the other five alternatives." The sixth alternative would allow Loon to improve its existing facilities and expand onto 581 acres of additional Forest Service land. In the existing permit area, Loon would widen established trails, add several new trails and one new lift, and improve existing lifts and restaurant facilities. In the new permit area, Loon would add a new lift and nine new trails. A new base lodge and an additional parking lot would be constructed on private land at the base of the new lift.

The sixth alternative would also allow Loon to significantly expand its existing snowmaking system. Over time, Loon would install new snowmaking pipes and extend snowmaking to all trails, both in the existing permit area, and in the new permit area. Although Loon would continue to use the East Branch, Boyle Brook, and Loon Pond as water sources for its snowmaking operations, Loon Pond would become its principle water source. Under this alternative, Loon would be permitted to draw the pond down by as much as fifteen feet for snowmaking, and the Town of Lincoln, which uses the pond as a source for drinking water, would be permitted to draw the pond down by as much as five additional feet. As a mitigation measure, Loon would be required to refill the pond by May first of each year with water pumped though its snowmaking system from the East Branch. The alternative would also impose other restraints on Loon's use of water from the East Branch and Loon Pond.

The Forest Service issued its ROD approving Loon's permit application on March 1, 1993. The decision authorizes "an expansion of the ski area both within the existing permit area and into an adjacent area of National Forest System lands known as South Mountain . . . as described in Alternative 6 in the Final EIS and later in the [ROD]." Plaintiffs commenced this

6

action after exhausting administrative remedies.

## II. DISCUSSION

### A. The Summary Judgment Standard

It is axiomatic that a court does not find facts in ruling on a motion for summary judgment. Instead, the court construes the evidence in the light most favorable to the nonmovant and determines whether the moving party is entitled to judgment as a matter of law. Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988). Less well understood is the effect that the burden of proof frequently has on the resolution of summary judgment motions.

If the party moving for summary judgment has the burden of proof at trial, the court will grant the motion only if: (1) the moving party initially produces enough supportive evidence to entitle the movant to judgment as a matter of law (i.e., no reasonable jury could find otherwise even when construing the evidence in the light most favorable to the nonmovant), and (2) the nonmovant fails to produce sufficient responsive evidence to raise a genuine dispute as to any material fact. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993). By

7

contrast, if the nonmovant bears the burden of proof, the court will grant the motion if: (1) the movant alleges that the nonmovant lacks sufficient proof to support one or more elements of her case, and (2) the nonmovant is unable to produce sufficient responsive evidence to withstand a motion for judgment as a matter of law.  Id.; see also, Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. denied, 504 U.S. 985, (1992).  Thus, the amount and quality of the responsive evidence that the nonmovant must produce to successfully resist a motion for summary judgment will depend upon whether the nonmovant bears the burden of proof at trial.  Fitzpatrick, 2 F.3d at 1115-17. Of course, if the parties agree on the material facts, the issues presented concern pure questions of law which can be resolved without regard to the burden of proof.

With these standards in mind, I turn to the merits of the cross-motions for summary judgment.

B.    **Clean Water Act Claim**

Plaintiffs argue that the Forest Service violated the CWA by allowing Loon to discharge East Branch water into Loon Pond

without an NPDES permit.[3]

The CWA was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.A. § 1251(a) (West Supp. 1995). In pursuit of this broad goal, the CWA assigns distinct enforcement roles to federal and state governments. PUD No. 1 v. Washington Dep't of Ecology, 114 S.Ct. 1900, 1905 (1994). The federal government is responsible for establishing and enforcing standards for certain "point source"[4] discharges under the NPDES permit program. See 33 U.S.C.A. §§ 1311, 1314 (West 1986 & Supp. 1995). The states, subject to federal approval, are required to develop and administer broad water quality and antidegradation standards that

---

[3] One of the EPA's CWA regulations states that the operator rather than the owner of a discharge facility must obtain any required NPDES permit. 40 C.F.R. § 122.21(b) (1994). The Forest Service relies on this regulation in asserting that it cannot be held liable for failing to require Loon to obtain an NPDES permit even if Loon, as the discharger, is obligated to obtain a permit. Since I determine that plaintiffs' CWA claim lacks merit, I need not address the Forest Service's argument.

[4] The CWA defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C.A. § 1362(14) (West Supp. 1995).

are intended to comprehensively address the adverse water quality effects of both point, and non-point sources. Id. at § 1313.

The CWA specifies that an NPDES permit is required for any action that will result in "the discharge of any pollutant." 33 U.S.C.A. §§ 1311(a), 1342(a). In the context of the present case, this phrase is defined in pertinent part as "any addition of any pollutant to navigable waters from any point source." Id. at § 1362(12). Plaintiffs and the Forest Service agree that: (1) both the East Branch and Loon Pond are "navigable waters"; (2) the East Branch, like all navigable waters, meets the CWA's definition of "pollutant";[5] and (3) the release of East Branch water into Loon Pond through Loon's snowmaking equipment will come "from" a "point source." Moreover, the record contains no evidence suggesting that Loon plans to add any additional pollutants to the East Branch water that it intends to discharge into Loon Pond. Thus, the parties' disagreement about whether Loon needs an NPDES permit centers on whether the discharge of

_____

[5] The CWA defines pollutant broadly to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C.A. § 1362(6) (West 1986).

10

East Branch water into Loon Pond will result in "any addition" of pollutants to the "navigable waters."

In resolving this statutory construction question, I begin by examining the disputed text in the context in which it appears. Gwaltney of Smithfield v. Chesapeake Bay Found., 484 U.S. 49, 56 (1987). If the disputed language can have only one plausible meaning, I ordinarily will proceed no further. Ardestani v. INS, 502 U.S. 129, 135-36 (1991); American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982). However, if the text is ambiguous, it may be appropriate to look to extrinsic sources to aid my analysis. Cf. Shannon v. United States, 114 S. Ct. 2419, 2426 (1994) (noting Justices' differing views concerning the usefulness of legislative history in statutory construction). Alternatively, I may be required to follow one of several default rules that require the resolution of ambiguities in a particular way. See, e.g., Chevron USA v. Natural Resources Defense Council, 467 U.S. 837, 843-45 (1984) (court should defer to agency's reasonable interpretation of ambiguous statute within the agency's regulatory domain).

Although the parties suggest that their disagreement concerns the meaning of "addition," it really hinges on the meaning of "navigable waters." "Addition" is not defined in the

11

CWA. However, it is commonly understood to mean the act of combining one thing with another in a way that results in an increase in what was originally there. See Random House Unabridged Dictionary 22-23 (2d ed. 1987). To illustrate the point, say we have a pond containing pollutants and we release water containing pollutants from an external source into the pond. We all understand that we have added pollutants because we have increased the total amount of pollutants in the pond. In contrast, say we have the same pond, but instead of adding water from an external source, we place a pipe in the pond and we pump the pond water from the bottom to the surface. No one would reasonably contend that internal pumping causes an "addition" of pollutants to the pond. Instead, we would consider the pumping to be a redistribution of pollutants from one part of the pond to another. Neither side disputes this understanding of the term. Nevertheless, if I substitute "navigable waters" for "pond" in this example, and run the pipe from one navigable water body into another, the dispute re-emerges. Thus, the question to resolve is whether transferring water from the East Branch to Loon Pond discharges water into the navigable waters from an external source, as plaintiffs contend, or whether it merely moves water from one part of the navigable waters to another, as defendants

12

argue.

Defendants understand "navigable waters" to refer collectively to all of the waters of the United States. Thus, they argue that the discharge of East Branch water into Loon Pond by itself, cannot result in any addition of pollutants to navigable waters because both the East Branch and Loon Pond are navigable waters and the discharge will not increase pollutants in the navigable waters as a whole. Plaintiffs disagree and instead contend that the statutory reference to navigable waters should be deemed to refer to specific bodies of navigable water. Thus, they argue that releasing East Branch water into Loon Pond constitutes an addition of pollutants into navigable waters because the East Branch and Loon Pond are each separate navigable bodies of water and East Branch water contains pollutants.

The principal flaw in plaintiffs' argument is that it is incompatible with the text they rely on to support their claim. The CWA specifies that an NPDES permit is required only if a discharger adds pollutants to "navigable waters." 33 U.S.C.A. § 1362(12). "Navigable waters" is defined as "the waters of the United States including territorial seas." Id. at § 1362(7) (emphasis added). The definition of "navigable waters" as a singular entity, "the waters of the United States," explains that

13

the bodies of water are not to be considered individually in this context. This use of a definition of "navigable waters" that does not differentiate among separate water bodies can only be understood to refer to "navigable waters" in a collective sense. Because plaintiffs' interpretation is incompatible with the text's plain meaning, I must reject it unless this case presents one of the "rare and exceptional circumstances" in which a contrary legislative intent is clearly expressed. Ardestani, 502 U.S. at 135 (quoting Rubin v. United States, 449 U.S. 424, 430 (1981)).

Plaintiffs have not identified anything in the CWA's legislative history to support their interpretation, and the cases they rely on are unhelpful. In Committee to Save Mokelumne River v. East Bay Mun. Util. Dist., the court determined that the defendants needed an NPDES permit to release water discharged from a reservoir through a point source into the navigable waters because the defendants used the reservoir to collect runoff containing pollutants from its mining operations. 13 F.3d 305, 308 (9th Cir. 1993), cert. denied sub nom., Members of the Cal. Regional Water Quality Control v. Committee to Save the Mokelumne River, 115 S. Ct. 198 (1994); see also West Virginia Coal Ass'n v. Reilly, 728 F. Supp. 1276 (S.D.W.Va. 1989) (mine runoff),

14

aff'd without op., 932 F.2d 964 (4th Cir. 1991). Similarly, in Daque v. Burlington, 935 F.2d 1343, 1354-1355 (2d Cir. 1991), rev'd, in part, on other grounds, 505 U.S. 557 (1992), the court held that the defendant needed an NPDES permit to release water through a culvert into a marshy area because the defendant was releasing pollutants from its landfill into the water passing through the culvert. Id. In each case, the court properly concluded that the discharger needed an NPDES permit, because the discharge added pollutants to the navigable waters from an external source. See National Wildlife Fed'n v. Consumers Power Co., 862 F.2d 580 (6th Cir. 1988) (no addition unless pollutants are added from an external source); see also National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 165 (D.C. Cir. 1982).

Plaintiffs also argue that I must defer to what they contend is the EPA's contrary interpretation of "navigable waters." I reject this argument for two reasons. First, while I will defer to reasonable agency interpretations of ambiguous statutes, such deference is unwarranted in cases such as this where the statute's meaning is plain. Chevron, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress."); Norfolk & W. R.

15

Co. v. American Train Dispatchers Ass'n, 499 U.S. 117 (1991).

Second, the EPA statement plaintiffs rely on does not support

their interpretation.  The statement is contained in a

"Supplementary Information Document" the EPA issued in March 1995

in connection with the development of water quality rules for the

Great Lakes System.  The document provides, in pertinent part,

that:

> EPA believes that the pivotal fact for
> determining whether an addition has taken
> place for purposes of Section 402 of the CWA
> is simply whether a pollutant is physically
> moved from outside of the waterbody into the
> waterbody by the discharger via a point
> source.  In EPA's view, the appropriate
> analytical scope for answering this question
> need go no further than the end of a
> facility's discharge pipe.  If, immediately
> prior the discharge activity, the pollutant
> was not contained in waters of the United
> States, then the release of the pollutant
> into the waterbody is quite logically an
> "addition" of that pollutant to the water-
> body.

Water Quality Guidance for the Great Lakes System: Supplementary

Information Document (SID) at 355 (March 1995).  Notwithstanding

plaintiffs' contrary argument, this statement merely describes

the EPA's position that the addition of water containing

pollutants from outside the waters of the United States into

those waters qualifies as an addition of pollutants regardless of

16

whether the water was once part of the waters of the United States. It in no way supports plaintiffs' different contention that the transfer of water from one body of water into another adds pollutants to the navigable waters.

Plaintiffs next argue that water drawn into Loon's pumping and snowmaking system loses its status as part of the navigable waters. Therefore, they contend, subsequent discharges of the water from the snowmaking system into Loon Pond adds pollutants to the navigable waters from an external source. This argument is based on two related contentions. First, plaintiffs contend that water cannot be part of the navigable waters when it is rendered non-navigable by being confined in Loon's snowmaking pipes. Second, they argue that water loses its status as part of the navigable waters when Loon uses it to operate its snowmaking system. For the reasons I describe below, neither contention is persuasive.

To the extent that plaintiffs base their argument on the assumption that water cannot be part of the navigable waters unless it is actually navigable, their argument is inconsistent with both the text of the CWA and Supreme Court precedent. As I previously noted, the term "navigable waters" is defined broadly as "the waters of the United States." Thus, the statutory

17

definition does not restrict the term's scope in the manner plaintiffs suggest. More importantly, plaintiffs' argument is foreclosed by the Supreme Court's opinion in United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131 (1985), which acknowledges that water need not be actually navigable to qualify as part of the navigable waters under the CWA.

Plaintiffs' argument that water loses its status as part of the navigable waters if it is commercially exploited fairs no better. The CWA's definition of navigable waters contains no such limitation and the EPA's regulations implementing the CWA define "waters of the United States" to include any water from "intrastate lakes, rivers, streams . . . [w]hich are used or could be used for industrial purposes by industries in interstate commerce." 40 C.F.R. § 122.21 (1994). Thus, the defining regulation contradicts plaintiffs' argument as it expressly provides that water does not lose its status as waters of the United States simply because it is exploited for a commercial purpose.

Plaintiffs argue that the EPA has taken a position contrary to the one expressed in 40 C.F.R. § 122.21 on at least one prior occasion. Plaintiffs point to a portion of the proposed regulations the EPA issued concerning water quality standards for

18

the Great Lakes System in which the agency stated "[o]nce water is removed for use in industrial operations, it has lost its character as waters of the United States and the discharge must be governed by appropriate conditions in an NPDES permit." 58 Fed. Reg. 20802, 20956 (proposed April 16, 1993). While the EPA statement supports plaintiffs' interpretation, it was not incorporated in the EPA's final regulations on the subject.[6] 60 Fed. Reg. 15366 (1995) (amending 40 C.F.R. Parts 9, 122, 123, 131 and adding 132). Moreover, the EPA's current position in this case is that Loon's use of East Branch water will not require an NPDES permit. Letter from John P. DeVillars, Regional Administrator, EPA, to New Hampshire Congressional Delegation, et al. (May 5, 1995). Under these circumstances, I decline to adopt an interpretation of "navigable waters" that is inconsistent with both the text of the statute itself and the EPA's regulations

---

[6] The Supplementary Information Document issued in connection with the EPA's rulemaking on the issue reaffirms the EPA's position that the release of intake water into the navigable waters adds pollutants to those waters if the intake water was not part of the waters of the United States immediately prior to the discharge. It does not, however, discuss the EPA's statement in the proposed regulations that intake water loses its status as part of the navigable waters if it is commercially exploited. SID at 355.

19

interpreting the statute.[7]

In summary, since the East Branch water drawn into Loon's snowmaking system retains its status as navigable waters and Loon will not add pollutants to those waters, its subsequent release of East Branch water into Loon Pond adds no pollutants to the navigable waters within the meaning of the CWA. Therefore, Loon is not required to obtain an NPDES permit to discharge East Branch water into Loon Pond.

C. **State Antidegradation and Water Quality Standards Claim.**

Plaintiffs next argue that Loon's proposed use of Loon Pond

---

[7] Plaintiffs also rely on <u>dicta</u> in the Sixth Circuit's opinion in <u>Consumers Power</u>. Although the <u>Consumers Power</u> court did state that water that is diverted by industrial operations for cooling purposes loses its status as part of the waters of the United States, the example chosen by the Court to illustrate this point involved the addition of pollutants to the intake water by the discharger. 862 F.2d at 589. In the present case, there is no evidence that Loon will add pollutants to the East Branch water it will discharge into Loon Pond. Thus, the facts of this case are distinguishable from the <u>dicta</u> in <u>Consumers Power</u>. Finally, plaintiffs' citation to <u>United States v. Law</u>, 979 F.2d 977, (4th Cir. 1992), <u>cert. denied</u>, 113 S. Ct. 1844 (1993), is also unpersuasive. In <u>Law</u>, the discharger operated a water treatment system. EPA regulations expressly provide that water drawn into such systems ceases to be part of the waters of the United States. 40 C.F.R. § 122.21. Thus, while the court correctly determined in <u>Law</u> that the release of intake water containing pollutants from a water treatment system adds pollutants to the navigable waters, that case does not in any way support the plaintiffs' argument that a similar result is required here.

will violate New Hampshire's Antidegradation and Water Quality standards.[8]

When, as in this case, an applicant for a federal permit proposes to undertake an activity that "may result in any discharge into the navigable waters," the CWA requires the applicant to obtain certification from state authorities that the proposed activity will not violate state water quality standards. 33 U.S.C.A. § 1341(a)(1). Although the Forest Service obtained the required state certification, plaintiffs apparently contend that the certification was improperly granted and, therefore, the Forest Service violated the Administrative Procedures Act ("APA") by accepting the certification.[9]

--------

[8] Loon Pond qualifies as an "outstanding resource water" under New Hampshire's antidegradation regulations. N.H. Code Admin. R. Env-Ws 437.06(a) (1991). These regulations prohibit "[n]ew or increased discharges of pollutants to such waters are prohibited unless the petitioner can prove to the division, in accord with the state's antidegradation implementation policy, that the discharge is for the express purpose and intent of maintaining or enhancing the water resource and its beneficial use." Id. at 437.06(b). Plaintiffs argue that Loon's plan will violate this regulation by adding pollutants to Loon Pond. They also argue that the plan will violate the state's water quality standards for grease, phosphorous, turbidity, and pH. See id. at 432.03.

[9] Plaintiffs concede that they cannot base their water quality standards claim on the CWA's citizen suit provision. See Oregon Natural Resources Council v. United States Forest Serv.,

The fatal flaw in the plaintiffs' argument is that it is based on the incorrect assumption that the Forest Service must independently determine whether the proposed activity will comply with state water quality requirements. The CWA expressly delegates to the states the duty to determine whether a proposed activity will violate state water quality standards. 33 U.S.C.A. § 1341(a). Moreover, the CWA specifies that a federal permitting authority is not authorized by NEPA to review "the adequacy of any certification under section 1341." 33 U.S.C.A. § 1371(c)(2)(A) (West 1986). Relying on these provisions, the First Circuit has determined that "federal courts and agencies are without authority to review the validity of requirements imposed under state law or in a state's [§ 1341] certification." Roosevelt Campobello Int'l Park Comm'n v. United States EPA, 684 F.2d 1041, 1056 (1st Cir. 1982); see also, New England Coalition v. United States Nuclear Regulatory Comm'n, 582 F.2d 87, 98-99 (1st Cir. 1978) (NRC need not independently review the EPA's CWA determinations when licensing a nuclear power plant). If the

_____

834 F.2d 842, 859 (9th Cir. 1987). Instead, they contend that the Forest Service's acceptance of an erroneous state certification violates the APA because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1977).

22

plaintiffs in this case were dissatisfied with the state's § 1341 certification, they could have challenged the certification by exhausting state administrative remedies and filing a timely challenge in the New Hampshire Supreme Court. See N.H. Code Admin. R. Env-Ws 415.14 (1991) ("Any person aggrieved by a final decision of the division on application pursuant to these rules may appeal the decision to the water supply and pollution control council pursuant to RSA 21-0:14."); N.H. Rev. Stat. Ann. § 21-0:14 (1988 & Supp. 1994) (providing that aggrieved persons may appeal decisions of the council to state court pursuant to N.H. Rev. Stat. Ann. § 541); N.H. Rev. Stat. Ann. § 541:6 (1974) (authorizing aggrieved party to appeal to the New Hampshire Supreme Court within thirty days after a petition for rehearing is denied or a decision following a rehearing). However, they are not entitled to circumvent these procedures by raising their claim for the first time in federal court.

### D. National Environmental Policy Act Claims

Plaintiffs also challenge the adequacy of the FEIS and the process by which it was prepared. Specifically, they argue that the Forest Service violated NEPA because the FEIS does not adequately: (1) identify and discuss alternatives to the proposed action; (2) describe the environment that would be affected by

the proposed action; (3) consider the proposed action's environmental impact; and (4) respond to public comments concerning the proposed action. They also contend that the Forest Service violated NEPA by failing to provide notice and an opportunity for public comment on the selected alternative and by violating an executive order barring any federal assistance for new construction in wetlands areas unless the agency involved determines that there are no practicable alternatives to the proposed action. Before discussing the merits of these claims, I review NEPA's relevant requirements and the standard of review that guides my analysis.

NEPA establishes certain "action forcing" procedures that were designed to insure that agency decisionmakers collect, analyze, and disseminate to the public detailed information concerning the environmental impact of proposed actions. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). Specifically, NEPA requires that proposals for major federal actions significantly affecting the quality of the human environment must be accompanied by an EIS containing a "detailed statement" describing:

> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

24

(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C.A. § 4332(2)(C).

NEPA's implementing regulations provide more specific guidance concerning the EIS process. First, an agency must prepare both a DEIS and an FEIS. It must also prepare an SEIS at either stage if, among other things, "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(1)(i) (1994). Second, the agency must

> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
>
> (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
>
> (c) Include reasonable alternatives not within the jurisdiction of the lead agency.
>
> (d) Include the alternative of no action.
>
> (e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement, and identify such alternatives in the final statement unless another law prohibits the expression

25

> of such a preference.
>
> (f)  Include appropriate mitigation measures not already included in the proposed action or alternative.

Id. at § 1502.14.  Third, the EIS must "succinctly" describe the environment of the affected area and discuss both the direct and indirect environmental effects of the listed alternatives.  Id. at §§ 1502.15, 1502.16.  Finally, the agency must assess, consider and respond in the final EIS to agency and public comments on the DEIS.  Id. at § 1503.4.

In meeting these obligations, an agency preparing an EIS must employ what the Supreme Court has referred to as a "rule of reason."  See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 373 (1989) (agency should use rule of reason in deciding whether to issue an SEIS); see also, Valley Citizens for Safe Env't v. Aldridge, 886 F.2d 458, 460 (1st Cir. 1989) (EIS must contain a reasonable discussion of alternatives); Sierra Club v. Marsh, 976 F.2d 763, 767-68 (1st Cir. 1992) (EIS must discuss only "reasonably foreseeable" impacts).  Norfolk v. United States EPA, 761 F. Supp. 867, 878 (D. Mass. 1991), aff'd without op. 960 F.2d 143 (1st Cir. 1992) (agency must reasonably respond to public comments).  Thus, an EIS need not identify every conceivable alternative or evaluate highly speculative or

26

indefinite potential impacts.  Vermont Yankee Nuclear Power Corp.
v. Natural Resources Defense Council, 435 U.S. 519, 551 (1978);
Sierra Club, 976 F.2d at 767-68.  Instead, it is sufficient if
the EIS contains "'such information as appears to be reasonably
necessary under the circumstances for evaluation of the
project.'"  Id. at 767 (quoting Britt v. United States Army
Corps. of Engineers, 769 F.2d 84, 91 (2d Cir. 1985)).

A reviewing court may invalidate an EIS only if the agency's
actions are "'"arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with the law."'"  Sierra Club, 976
F.2d at 769 (quoting Conservation Law Found. v. Secretary of the
Interior, 864 F.2d 954, 957 (1st Cir. 1989) (in turn quoting 5
U.S.C.A. § 706(2)(A))).  This standard is highly deferential
because decisions about matters such as whether a change in the
proposed action is significant enough to warrant the issuance of
an SEIS, whether a particular alternative is reasonable, and
whether a potential impact is speculative present "classic
example[s] of . . . factual dispute[s] the resolution of which
implicate[] substantial agency expertise."  Oregon Natural
Resources Council, 490 U.S. at 376; accord Sierra Club, 976 F.2d
at 769.  Thus, the reviewing court's standard of review will be
whether "the agency decision, in the context of the record, is

27

too 'unreasonable' (given its statutory and factual context) for the law to permit it to stand." <u>Sierra Club</u>, 976 F.2d at 769; quoting <u>Sierra Club v. Marsh</u>, 769 F.2d 868, 871 (1st Cir. 1985).

With these general principles in mind, I turn to plaintiffs' specific claims.

1. <u>Duty to present and evaluate alternatives</u>.

a. **Alternative sites**.

The Forest Service determined that Loon's purpose in expanding is to "meet the increased demand for the recreational experience traditionally provided at Loon and to plan for projected growth in the number of skier visits to Loon." In determining whether this purpose could be fulfilled by expanding other ski areas, the Forest Service restricted its detailed analysis of alternatives to the four other ski areas located in the White Mountain National Forest ("WMNF").[10] Plaintiffs argue that the Forest Service violated NEPA by failing to also consider the possibility of expanding other New England ski areas.

An FEIS's discussion of alternatives "need not extend [to alternatives] beyond those reasonably related to the purposes of

_____

[10] These ski areas are Cannon, Waterville, Wildcat, and Attitash.

28

the project." Laguna Greenbelt, Inc. v. United States Dept. of Transp., 42 F.3d 517, 524 (9th Cir. 1994). Consistent with the purpose of Loon's proposed expansion, the Forest Service decided not to examine whether the demand for additional skiing could be met through expansion at ski areas in Vermont because Vermont's ski areas drew their skiers primarily from Connecticut and New York, whereas Loon was attempting to satisfy the demand for skiing in the Massachusetts and Southern New Hampshire markets. It did not consider whether the demand could be met by expansion at any of the approximately twenty other New Hampshire ski areas that are not located in the WMNF because those ski areas did not offer the same type of skiing experience as the WMNF ski areas which have more terrain, higher mountains, more natural snow, and better facilities than their counterparts outside the WMNF. While plaintiffs plainly disagree with these conclusions, they have not established that they were arbitrarily made. Therefore, they did not provide a basis for invalidating the FEIS.

### b. Alternative snowmaking water sources.

The plaintiffs next contend that the Forest Service unreasonably failed to explore alternatives to using Loon Pond as a water source for snowmaking. Plaintiffs quote excerpts from letters sent to the Forest Service suggesting that it consider

requiring Loon to construct a water storage system rather than use Loon Pond. In particular, Dubois suggested during the comment period that Loon install water storage tanks under the planned golf course. The Forest Service did not respond to any suggestions for alternative water storage, but did include a small storage pond as part of the snowmaking system in several of the alternatives it considered.

Alternatives two and three included an artificial pond of about one acre to be constructed near the base of the ski area. The parties agree that the small pond would have mitigated the demand for water from Loon Pond but would not have replaced Loon Pond as the water source for snowmaking. The small pond was not included in alternative six, the Forest Service now explains, because the alternative's trail design did not require sediment impoundment during construction and because there was no natural drainage in the area where the trails were to be located. The Forest Service also explains that it did not consider the construction of underground storage tanks to be a reasonable alternative both because they would have to be too large and because their construction would produce adverse environmental impacts. It also contends that additional ecological stress would be put on the East Branch if it were used as Loon's sole

30

source for snowmaking water. Based on these concerns, the Forest Service claims that a storage facility alternative would not feasible.

NEPA requires discussion of alternatives that are reasonable and appropriate for the purpose proposed, but does not require consideration of remote, speculative, fanciful, or hypothetical alternatives. Valley Citizens, 886 F.2d at 461. The Forest Service considered a small pond in the context of a trail system that made the pond practical, but concluded that constructing a facility to replace Loon Pond was not a feasible alternative both because of size and problems with water collection and use. The plaintiffs have not shown that Dubois or any other commentator offered specifics as to how to implement a suggested alternative water storage system. Finding no evidence that undermines the Forest Service's conclusion on this point, I conclude that the Forest Service did not arbitrarily exclude consideration of water storage facilities.

2.  Duty to describe the environment to be affected and consider potential impacts.

Plaintiffs argue that the Forest Service failed to gather enough data about Loon Pond to reasonably assess its current condition and the impact of the planned expansion. Specifically,

31

they allege that the Forest Service failed to: (1) evaluate the present condition of populations of open-water plants and animals in Loon Pond; (2) test water from the East Branch and Loon Pond for microscopic organisms and chemical content, including mercury and acidity, by sampling water from each monthly for one year; (3) inventory the plant species in the pond's littoral zone; (4) determine the amount and types of sediments that would be exposed to the air by drawdowns of the pond; (5) document the pond's "limnological" cycles; and (6) determine to what extent the pond is used by birds and animals. In addressing the plaintiff's argument, I begin by describing the information that the Forest Service did collect relevant to the pond's current condition.

According to the FEIS, Loon Pond is a steep-sided granite bowl with a relatively small ring of shallow area around its perimeter. It has approximately sixteen acres of surface area and a maximum depth of sixty-five feet. It has an eight-foot high concrete dam on one end. The pond has historically been used both as a primary water source for the Town of Lincoln, and as a snowmaking water source for Loon. As a result, its water level fluctuates on average four to six feet per year. In 1989, the pond was drawn down ten and one-half feet.

32

Water quality samples taken in 1988 showed that the pond's pH levels were low during the spring, but became less acidic after the spring runoff season. A 1951 survey of the pond's vegetation characterized both its emergent and submerged vegetation as "scant" and those conditions were found to have persisted when the pond was again examined in 1988. Qualitative sampling of the pond for invertebrates in 1988 revealed what the FEIS characterized as a "healthy aquatic community." The pond was again observed after the record ten and one-half foot drawdown in 1989 and in 1991. On both occasions, the abundance and position of aquatic plants were found to be similar to conditions observed in 1988. Invertebrates and tadpoles were also found to be abundant in the shallow area near the pond's spillway in 1989. However, because of its low pH, the Forest Service concluded that the pond does not provide a suitable habitat for a self-sustaining fish population.

In arguing that the FEIS does not sufficiently describe Loon Pond's current condition, plaintiffs rely heavily on a hypothetical "worst case scenario" for the pond described by a Forest Service scientist, Ron Buso, in a December 1987 letter to a Forest Service hydrologist. Buso expressed three primary concerns. First, he stated his belief that a drawdown would

33

destroy all plants and animals in the pond's littoral zone. Second, although his impression was that sediments in the pond's shore area were "course-mineral in character," he stated that if those sediments turned out to be "fine mineral/organic" in nature, the repeated freeze-drying and rewetting of the sediments that would result when the pond was drawn down and refilled could lead to "increases in turbidity (fine silts and clays?), biological oxygen demand (organic ooze?), and dissolved substances (e.g., metals?)." Third, he speculated that a twenty-foot drawdown of the pond could make it more acidic if the pond were refilled with strongly acidic spring runoff. If these concerns turned out to be valid, Buso hypothesized the following worst-case scenario:

> After a 5-10 yr. span of 6-M draw-down and re-fill:
> (1) Loon Pond becomes more acidic, remaining below pH 5 year-round;
> (2) Metals in sediments (Al, Fe, Zn, Pb) become more abundant in their dissolved forms;
> (3) Nutrients released from sediments promote severe algal blooms;
> (4) Outflow water becomes murky, discolored, distasteful;
> (5) Oxygen demand at depth increase, fisheries potential is lost.

Plaintiffs contend that the Forest Service acted arbitrarily in failing to gather more data concerning the pond's current condition and in failing to address the potential adverse impact

34

Buso describes.

The administrative record does not contain a response to Buso's letter and since the letter was not generated during the public comment period on the DEIS, no response was required.[11] Nevertheless, the Forest Service did respond to several similar concerns expressed by other commentators. One commentator stated that the Forest Service should conduct an invertebrate study of the pond and the Forest Service responded by stating that although its studies had not been exhaustive, they were "completed to a level sufficient to allow a reasoned choice among the alternatives in this final EIS." Other commentators expressed concern over the impact on aquatic biology resulting from repeatedly drawing down and refilling the pond. In responding to these comments, the Forest Service relied on its observations of the pond and its aquatic biology in 1988, 1989, and 1991. Based upon these observations, it concluded that the proposed drawdown

---

[11] Even if the letter had been generated during the comment period, the Forest Service would not have been obligated to address Buso's speculations in the FEIS since NEPA does not require the evaluation of "worst case scenarios." Methow Valley, 490 U.S. at 354-55.

35

[w]ould affect the same narrow shallow band of area
around the pond that previous drawdowns have affected,
including the 10.5-foot drawdown in 1989.  This
relatively simple ecosystem of this shallow band,,
primarily aquatic plants and aquatic insects, have
apparently not been adversely affected by past
drawdowns based on their abundance during sampling in
1988 and 1989.  Based on this information, it is
doubtful this ecosystem would be affected by future
drawdowns under this alternative.  Shallow littoral
areas were not available under present draw-down levels
once the pond is frozen and this situation would not
change.  Somewhat less open water--deep habitat would
be available than at present, but it is doubtful this
type of habitat would be limiting to the pond's
inhabitants.

In short, the Forest service concluded that the pond's

aquatic biology and water quality were not likely to be adversely

affected by the proposed expansion plan.  It based these

conclusions on surveys of the pond and its plants and animals

before and after the significant drawdown in 1989.  While, with

the benefit of hindsight, additional studies might have developed

additional information about the pond's current condition, the

Forest Service's description of the pond is adequate to support

its impact analysis.[12]

---

[12]  Dubois also submits affidavits from several scientists,
purporting to show that additional testing was required to
adequately assess the environmental impact of the project on Loon
Pond.  These opinions are not part of the administrative record
here and were not offered to the Forest Service during the EIS
process.  Although I could consider extrinsic information such as

3.  Response to public comments.

While preparing the FEIS, the Forest Service was obligated to assess and respond to public comments.  40 C.F.R. § 1503.4(a). The required response may be made by modifying the alternatives, developing and evaluating a new alternative, supplementing, improving, or modifying the previous analyses, making factual corrections, or explaining "why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicat[ing] those circumstances which would trigger agency reappraisal or further response."  Id.  The plaintiffs challenge the Forest Service's response to comments on the following topics:  (1) dissolved oxygen levels in Loon Pond; (2) Lincoln's ability to meet is water supply needs; (3) cumulative impacts of ski area development within the WMNF; (4) impact of traffic on Route 112 east of Loon; (5) mitigation measures for Lincoln's sewage lagoons; (6) impact of parking lot run-off.  I address each topic in turn.

_____

this in order to clarify the administrative record, I do not find the affidavits helpful for that purpose.  Valley Citizens, 886 F.2d at 460; accord Sierra Club, 976 F.2d at 772-73; National Audubon Society v. United States Forest Serv., 46 F.3d 1437, 1447 (9th Cir. 1994).

37

### a.  Dissolved oxygen levels in Loon Pond.

Plaintiffs challenge the Forest Service's response to a concern expressed by the EPA about the potential for depletion of dissolved oxygen in Loon Pond.  The EPA raised the issue in a letter dated October 13, 1988, reviewing "the second draft of Chapter 3 and the first draft of Chapter 4 of the U.S. Forest Service's EIS for the proposed Loon Mountain expansion project."

The regulation requiring an agency to solicit comments provides that "[a]fter preparing a draft environmental impact statement and before preparing a final environmental impact statement" the agency shall obtain comments from any federal agency that has jurisdiction or expertise as to any involved environmental impact and request comments from others.  40 C.F.R. § 1503.1(a) (1994).  Agencies with particular expertise are required to comment within the applicable time period.  Id. at §§ 1503.2, 1506.10.  An agency issuing an FEIS is required to attach "[a]ll substantive comments received on the draft statement" even if the agency determines that individual response is not necessary.  Id. at § 1503.4(b).  Since the EPA's statements concerning dissolved oxygen were made prior to the issuance of the DEIS, the Forest Service was not required to formally respond

in the FEIS.  Further, the EPA's 1988 letter states that "[a]s in the past, these do not necessarily represent our final comments on the document and we will keep you informed of any additional comments we may have."  Since the EPA did not express this concern again in its formal comments on the DEIS, the FEIS cannot be faulted for failing to respond directly on the subject.[13]

   **b.   Evaluation of Lincoln's water supply needs.**

The plaintiffs contend that the Forest Service violated NEPA by failing to respond to comments about Lincoln's water supply needs that the EPA raised in a January 1993 letter.  In essence, the EPA letter expresses a disagreement with the way in which the Forest Service analyzed the town's water needs separately from the effects of the proposed project.  Specifically, the EPA letter expressed concern that the Forest Service should not "approve a permit that will lead to a worsening of [Lincoln's water supply] situation based on an assumption that a solution to the town's current problems will be found."

---

[13]   As I have previously noted, the FEIS does respond to the somewhat more general concerns expressed by others that plant and animal life in the pond would be harmed if Loon and Lincoln were permitted to repeatedly draw the pond down by as much as twenty feet.

First, there is no dispute that the Forest Service addressed the issue of Lincoln's water supply needs during the EIS process. The issue was revisited in the Forest Service's decision to grant the permit. The Forest Service also responded generally to comments on the RDEIS about Lincoln's water system in the FEIS. The 1993 letter was a comment on the FEIS, and consequently could not have been included in the response section of the FEIS.

Once an FEIS is prepared, questions aimed at its sufficiency require consideration of whether a supplement to the FEIS is necessary. 40 C.F.R. § 1502.9(c). A supplement would have been required in this case only if the EPA's 1993 letter showed that the Forest Service had made substantial changes in the proposed action relevant to environmental concerns, or if the letter introduced "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Id. at § 1502.9(c)(1)(ii). That is not the case here. Thus, the Forest Service's lack of response to the letter was not in violation of its obligations under NEPA and the issues raised in the letter were addressed during the EIS process.

### c. Cumulative impacts.

The plaintiffs cite another section of the EPA's 1993 letter in which the EPA disagreed with the Forest Service's conclusion

40

that the potential impacts on water supplies due to the demands of any future expansion at other WMNF ski areas were not cumulatively significant. Again, the plaintiffs expect a NEPA-induced reply from the Forest Service. As discussed above, because the 1993 letter responded to the FEIS, the relevant question here is whether the Forest Service should have supplemented the FEIS in response to the letter. The letter's comment merely expresses disagreement with the Forest Service's evaluative conclusion, but does not suggest circumstances that would require a supplement. See 40 C.F.R. § 1502.9(c). Thus, the Forest Service's silence following the EPA's letter on this issue was not unreasonable.

### d. Traffic on Route 112.

In a comment letter to the Forest Service, Dubois noted that the RDEIS predicted that the expected traffic would strain Route 112 and that consideration of expanding the "traffic carrying capacity" of the highway was underway. He then commented:

> The RDEIS fails to adequately assess the likely impact
> of the Loon Mountain development alternatives on this
> highway. Information on the likelihood that Loon
> development will require expansion of Highway 112
> should be made now before the project is approved.

The Forest Service responded:

41

There are several options provided in Volume I pages 220-222 for safe access to and from Loon Mountain. None of them would involve altering Highway 112 between Conway, NH and the Loon Mountain access road. Those options include widening and improving ramps on and off Interstate 93, construction of the South Mountain access road, and providing additional traffic turning lanes at the intersection of Highway 112 and Loon Mountain Road.

Plaintiffs now contend that the Forest Service's response was inadequate because it failed to address the potential for traffic congestion on Route 112 east of Loon. If Dubois' comment was intended to raise a question about the adequacy of traffic studies for the eastern portion of Route 112, he missed his mark. His comment refers to the existing traffic studies in the RDEIS and expresses concern that the highway would be expanded to accommodate the traffic discussed there. The Forest Service reasonably interpreted his comment to ask for clarification of the expansion plans for Route 112 and responded accordingly. No more was required.

### e. Mitigation measures for Lincoln's sewage lagoons.

Dubois suggested two mitigation measures for the problem of leaking sewage lagoons in Lincoln's wastewater treatment system: require Loon to install synthetic liners in the lagoons to prevent leakage; or require certification from the EPA, as well as the state, that the lagoons are operating properly before

42

allowing construction to begin.  The Forest Service discussed
Lincoln's wastewater treatment system and the problem of leaking
sewage lagoons in the FEIS.  It responded to comments about the
leaking lagoons explaining that the alternatives under
consideration provide that "the proposed ski area construction
would not begin prior to construction of the water treatment
plant and operation of the sewage system in accord with state
law."  The Forest Service also addressed the issue of whether the
state should be responsible for determining the acceptable level
of operation of the wastewater treatment system.  In the ROD, the
Forest Service conditioned beginning construction in the
expansion area on "Lincoln's sewage system operating in
conformance with State requirements."  Although the Forest
Service never specifically answered Dubois' suggestion that Loon
install liners, it preempted the need for requiring specific
mitigation measures by imposing a general requirement that the
system must comply with all applicable state laws.  I do not find
that the Forest Service's failure to respond to Dubois'
suggestion of requiring liners was unreasonable.

### f.  Runoff from new parking areas.

The plaintiffs point to Dubois' comment concerning the
effect of runoff from the planned new parking area relative to

43

increasing the summer water temperatures in the East Branch and adding heavy metal contaminants. He proposed that Loon be required to mitigate these effects by collecting and treating all runoff water. The plaintiffs argue that the Forest Service failed to respond to Dubois' comment.

The Forest Service reported in the FEIS that "[c]ertain heavy metals such as lead, zinc, copper, chromium, nickel, and mercury are commonly found in urban runoff from parking lots and roads" and that those contaminants would be likely to occur due to the proposed development. In addition, the Forest Service conceded that "[t]hese non-point sources would result in the degradation of water quality if allowed to enter the stream, which could violate the state's antidegradation standards." In response, the Forest Service referred to its planned mitigation measures including "buffer strips to ensure natural infiltration and filtering before runoff reaches the river." In the ROD, the Forest Service noted concerns about contamination of the East Branch caused by runoff and other aspects of the expansion but concluded that the requirements of the Alteration of Terrain Permits would prevent any significant impact.

Because the Forest Service both considered the concerns raised by Dubois and addressed mitigation measures for the

44

potential impacts of parking lot runoff, the Forest Service's failure to discuss his specific proposal was not unreasonable.

    4.  Requirements of Executive Order 11,990.

The parties agree the FEIS must comply with the dictates of an executive order to satisfy NEPA requirements. See City of Waltham v. United States Postal Service, 786 F. Supp. 105, 132 (D.Mass. 1992), aff'd, 11 F.3d 235 (1st Cir. 1993). They disagree, however, as to whether the Forest Service adequately addressed the obligations imposed by Executive Order 11,990. Exec. Order No. 11,990, 42 Fed.Reg. 26,961 (1977), reprinted as amended in 42 U.S.C.A. § 4321 (West 1994). Executive Order 11,990 requires federal agency leadership and action to minimize destructive effects and "to preserve and enhance the natural and beneficial values of wetlands" when engaged in particular activities affecting land use. Exec. Or. No. 11,990 § 1(a). Specifically, the Executive Order directs that

> each agency, to the extent permitted by law, shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds (1) that there is no practicable alternative to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use.

Ex. Or. No. 11,990 § 2(a). Practicable, in this context, means

45

"capable of attainment within relevant, existing constraints." National Wildlife Federation v. Adams, 629 F.2d 587, 591-92 (9th Cir. 1980); accord County of Bergen v. Dole, 620 F. Supp. 1009, 1061 (D.C.N.J. 1985), aff'd without op., 800 F.2d 1130 (3d Cir. 1986). These requirements serve to focus agency attention on protecting wetland areas during the EIS process. See National Wildlife Fed'n, 629 F.2d at 591; Conservation Law Found. v. Department of the Air Force, 864 F. Supp. 265, 289 (D.N.H. 1994). The Executive Order does not prohibit action without an appropriate finding, but directs that such actions are to be avoided. National Wildlife Fed'n, 629 F.2d at 591.

The plaintiffs assert that the Forest Service failed to find that no practicable alternative to the use of Loon Pond existed and that all practicable measures to minimize harm to Loon Pond had been developed, and failed to consider appropriate factors for evaluating measures for minimizing harm. In its decision, the Forest Service stated that it had considered the Executive Order but did not make specific findings under those requirements.

To properly set the scope of practicable alternatives, it is important to remember that Loon is presently using water from Loon Pond for snowmaking under its existing permit and Lincoln

uses the pond as a primary municipal water source.[14]  The Forest

Service considered but rejected a suggested alternative of no

snowmaking because "snowmaking has become a necessity in eastern

skiing to assure a reasonable opening date and to provide skiing

during low natural snow years."  Thus, the relevant question is

whether the Forest Service considered the existence of

practicable alternatives and mitigation measures for the

increased use of Loon Pond to meet expected snowmaking needs.[15]

The Forest Service considered the water quantities needed

for snowmaking in six alternative plans ranging from no action to

full expansion onto South Mountain.  From those alternatives, it

chose alternative six, providing for limited expansion and water

withdrawal.  The Forest Service concluded that snowmaking was a

necessary component of skiing at Loon and that using Loon Pond as

the water source with limitations on withdrawals was the best

_____

[14]  Under a present agreement between Lincoln and Loon, Loon can drawdown the top eighteen inches of the pond for snowmaking and may take more as decided on a case by case basis.  Currently, Lincoln uses Loon Pond as a primary municipal water source, but is planning a water treatment system to use the East Branch as the primary water source and rely on the pond only for emergency needs.

[15]  I will assume, without deciding, that authorizing an increased use of the pond would fall within the definition of "new construction" as used in the Executive Order.

alternative.

Plaintiffs again raise the alternative of using water storage tanks. They argue in this context that the Forest Service failed to meet the requirements of the Executive Order because it made no finding that water storage tanks or artificial ponds were not practicable alternatives or mitigation measures. In the process of choosing alternative six, the Forest Service considered alternatives that included constructing a small pond. As explained in a previous section, the Forest Service did not consider construction of storage tanks to be a practicable solution and found that the artificial ponds were not useful in the trail configuration chosen in alternative six. I conclude that a specific finding to that effect is unnecessary as the reasons behind the Forest Service's decision meet the Executive Order standard. In summary, the Forest Service's conclusion that it had considered the requirements of Executive Order 11,990 was not arbitrary, despite the lack of specific findings, because the necessary considerations were included in the EIS process.

5. Is a supplement required?

NEPA contemplates significant public involvement in the information gathering process to produce an EIS. 42 U.S.C.A. § 4332(2)(C); 40 C.F.R. Parts 1502 & 1503; Methow Valley Citizens,

48

490 U.S. at 349.  Part of the process requires that EIS documents be made available for public comment.  Massachusetts v. Watt, 716 F.2d 946, 951 (1st Cir. 1983).  Public comment is elicited only in response to a DEIS, "[c]onsequently, an agency's failure to disclose a proposed action before the issuance of a final EIS defeats NEPA's goal of encouraging public participation in the development of information during the decision making process." Half Moon Bay Fishermans' Marketing Assoc. v. Carlucci, 857 F.2d 505, 508 (9th Cir. 1988).  To insure that the EIS process will come to an end, however, agencies must produce a supplement only if:

> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1); see also Oregon Natural Resources Council, 490 U.S. at 373.

The plaintiffs argue that the Forest Service was required to supplement the RDEIS and allow public comment on alternative six before it was selected.  Also, the plaintiffs contend that the Forest Service must now issue a supplement to the FEIS because the pumping system described in alternative six has been replaced

49

with a different plan that will have significant environmental effects.  I address each issue in turn.

### a.  Opportunity to comment.

Instead of supplementing the RDEIS, the Forest Service issued an FEIS that incorporated changes made in response to comments on the RDEIS.  It introduced and explained a new preferred alternative comparing it to the five previously considered alternatives.  The Forest Service described alternative six as a composite of several of the other alternatives with a few changes made in response to public comment.  The Forest Service represented that the changes made in alternative six, which were not previously considered in any of the other alternatives, did not present new environmental effects.  The plaintiffs point to several differences between alternative six and the previously considered alternatives, but they do not show that any of the changes were substantial or relevant to environmental concerns.

Plaintiff RESTORE also argues that a supplement is necessary in response to the Forest Service's new ecological approach under its New Perspectives program in managing the National Forests. RESTORE did not explain why the New Perspectives program constituted "new information [that] is sufficient to show that

50

the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered."  Oregon Natural Resources Council, 490 U.S. at 374 (footnote and citation omitted).

First, according to RESTORE, the New Perspectives program has been well known within the Forest Service since 1989. Second, beyond providing its own opinion, RESTORE did not demonstrate that the Forest Service failed to follow the New Perspectives program or that a consideration of "ecosystem management" under New Perspectives would make a significant impact in the context of the Loon expansion project.

The Forest Service's decision to present alternative six in the FEIS, rather than in a supplement to the RDEIS, is based on its expertise in analyzing information relevant to the various alternatives and comments.  Thus, I defer to the Forest Service's "informed discretion" that the FEIS was sufficient to provide the necessary information for an informed decision to choose alternative six and conclude that its decision was neither arbitrary nor capricious.  Oregon Natural Resources Council, 490 U.S. at 377.

**b.  Change in the plan since the ROD.**

In the ROD, the Forest Service described the approved

51

snowmaking and water pumping system as follows:

> Features of the snowmaking system include: 1) Water
> from Loon Pond would continue to be pumped from the
> current location and the present pumping equipment
> would be upgraded, providing water for snowmaking,
> rather than drilling through the side of the pond as
> proposed for other alternatives; 2) the up-mountain
> valving station and associated piping system would be
> expanded to handle the increased pumping; and 3) no
> snowmaking pond would be constructed in the Lift G
> area.
> Loon would maintain a minimum flow in Loon Pond Brook for
> Lincoln's water system either through the existing dam
> system when the pond is sufficiently full, or through the
> pumping system when the pond is low.

> Limitations on water use for this alternative include:
> a 15-foot maximum drawdown of Loon Pond for snowmaking;
> a 5-foot reserve for a total drawdown of 20 feet for
> the Town of Lincoln; no withdrawals from the East
> Branch Pemigewasset River at flows less than 85 cfs.

The parties agree that the plan for pumping water from Loon Pond
has been changed from that described in the ROD. As described by
the parties with supporting materials, the current plan calls for
a new pumphouse at a new site on the pond and construction of a
new water withdrawal system at the edge of the pond.
Construction of the new facilities would require blasting,
dredging, and filling an area of the pond.

Neither Loon nor Lincoln can begin construction of the new
water pumping system without Forest Service approval. In July of
this year, the Forest Service rescinded its approval of the new

52

pumphouse and water withdrawal site, and has not yet decided what action it may take in response to the requested change. At this juncture, no Forest Service action on this issue exists for review. Therefore, the plaintiffs' argument to require the Forest Service to supplement to RDEIS is premature.[16]

### III.  CONCLUSION

The Forest Service's motion for summary judgment (document no. 31) is granted. Loon's motion to dismiss (document no. 26) and plaintiffs' motions for summary judgment (document nos. 46, 54 and 56) are denied.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

November 2, 1995
cc:  Roland Dubois
     Jed Callen, Esq.
     Melanie A. Williams, Esq.
     Joel D. Armstrong, Esq.
     T. David Plourde, Esq.
     Sylvia Quast, Esq.

_____

[16] Plaintiffs also raise several less significant arguments in opposing defendant's summary judgment motion. I reject these arguments without further discussion because I determine that they plainly lack merit.

Cindy Hill, Esq.
Scott E. Hogan, Esq.
James L. Kruse, Esq.